18 U.S. 207
 5 L.Ed. 70
 5 Wheat. 207
 STEVENSON'S Heirs
v.
SULLIVANT.
 March 4, 1820
 
 1
 APPEAL from the Circuit Court of Ohio. This was a suit in Chancery, and the case upon the facts admitted by the parties, was as follows: Previous to the year 1775, Hugh Stephenson, of Virginia, lived and cohabited with Ann Whaley, and had by her the appellants in this cause, whom he recognized as his children. In July, 1775, he made his will, in which he described the appellants as the children of himself, and of his wife Ann, and devised the whole of his property to them, and to their mother. In July, 1776, he intermarried with the said Ann Whaley, and died the succeeding month, leaving her pregnant with a child, which was afterwards born, and was named Richard. The will was duly proved after the death of the testator. In June, 1776, the testator was appointed a colonel in the Virginia line, upon continental establishment, and died in the service. After his death, and the birth of Richard, a warrant for 6,666 and two-thirds acres of military lands, was granted by the State of Virginia to the said Richard, who died in the year 1796, in his minority, without wife or children, and without having located or disposed of the above warrant. His mother also died before the year 1796. The defendant claimed the land in controversy under John Stephenson, the elder paternal uncle of Richard; and the appellants having filed their bill in the Court below to recover the premises in question, the same was dismissed, and the cause was brought by appeal to this
 
 Feb. 18th.
 
 2
 Mr. Brush, for the appellants, stated, that the appellants insisted, that, as representatives of their father, Hugh, the warrant in question ought to have issued to them. All the laws of Virginia, granting military land bounties, were passed after the death of Hugh Stephenson. The act which extends the bounty to those who had died before any bounty was provided, is that under which the warrant issued. It assigns the bounty to the 'legal representatives' of the person upon account of whose services it was granted. We maintain, that the term, representatives, is used purposely not to exclude the heir, but to embrace others than the legal heir, under the then existing laws. It never could be intended to give a bounty to elder brothers and uncles, who might be in arms against the country; but to the immediate objects of the soldier's attention and care, whom, by his will, he had appointed to represent him, or to that class of relatives, among whom personal property was distributed by the statute of distributions; certainly more just and liberal in its provisions, than the feudal course of descents, by which real estate was cast on the eldest male relative in a collateral line. But, waving this point, the complainants maintain that they are heirs at law of Richard Stephenson. And they maintain this upon two grounds. First. By the Virginia law, regulating the course of descents, passed in 1785, they were legitimated. Second. By the same law, as bastards, they were made capable of inheriting to their deceased brother, on the part of the mother.
 
 
 3
 1. The ancestor of Richard never had any interest in the subject that constitutes the estate. It is a gratuity given to his representative, who most clearly took as a purchaser, and the estate he held, upon his decease, passed to his heirs generally, without reference to the channel through which he derived it. The estate originated under the laws of Virginia. The parties resided in Virginia, until the establishment of the State of Kentucky, where Richard died. The descent was cast, either under the laws of Virginia, or Kentucky; and, in this respect, they are the same. The act of 1785, provides, that 'where a man having by a woman one or more children, shall afterwards intermarry with such woman, such child or children, if recognized by him, shall thereby be legitimated.' In the case of Rice v. Efford,a and in the case of Sleighs and Strider, cited by Judge Tucker, and given in a note,b it is decided, that this act includes cases of births and marriages, antecedent to its passage. This is its plain and natural interpretation. It was meant, as the Judges say, 'to protect and provide for 'the innocent offspring of indiscreet parents, who had already made all the atonement in their power for their misconduct, by putting the children, whom the father recognized as his own, on the same footing as if born in lawful wedlock.' It meant to put them on the same footing, not only as it respected their father's estate, but in relation to the estates of each other, and the estates of all their kindred. In both the cases above cited, the father died after the act of 1785 took effect; and, in that point, the present case is to be distinguished from them. It would appear, from the case of Rice v. Efford, that the Chancellor considered it a material point, that the recognition of the illegitimate children took place after the act of 1785 was in operation. And Judge Roane expressly says, that the interpretation adopted, 'applies to cases only, where the father has died
 
 
 
 a
 3 Henn. & Munf. 225.
 
 
 b
 Id. 229. posterior to the passage of the act.' This observation of Judge Roane may properly be termed an obiter dictum. The case before him did not require that point to be decided; and, we conceive, that the dictum is demonstrably incorrect, as is also the intimation of the Chancellor. The object of the act was to 'protect and provide for the children,' by giving them a complete capacity of inheritance. To give them this title, the law requires two facts; the marriage, and the recognition by the father. But, it is said, that although the law embraces the case of an anterior marriage, the recognition must be subsequent. Why this distinction? The grammatical construction of the sentence does not require it. The terms, 'shall afterwards intermarry,' are correctly referred to the birth of the children, not the date of the act. In relation to the marriage and the recognition, the statute speaks from the same time. The whole structure of the sentence necessarily connects them. The active participle, 'having,' in reference to the birth of the children, and the passive participle, 'recognized,' in relation to their acknowledgment, are the only terms which could properly be used to describe both anterior and subsequent cases with reasonable precision. Surely it would be a strange construction, by which the active participle is made to embrace both the past and future, while the passive participle, in the same sentence, is confined to future cases only! This can only be done by interpolating the word hereafter, so as to make that part of the sentence read, 'such child or children, if HEREAFTER recognized by him.' The object of the statute does not require, but absolutely forbids such interpolation. It was designed, as the Court say, in the case of Stones v. Keeling,c to establish the most liberal and extensive rules of succession to estates, 'in favour of all, in whose favour the intestate himself, had he made a will, might have been supposed to be influenced.' It operates solely upon the children, and it must have been designed to operate equally upon all in the same situation, whether the acknowledgment was made before or after the passing of the act. The dictum of Judge Roane, evidently grew out of an argument suggested by himself, that the interpretation adopted by the Court, might be considered an invasion of private right. We see no difficulty on this ground; but if there were any, it is not remedied by applying the act to cases only where the father died posterior to its passage.
 
 
 
 4
 The possible interest which children have in the father's property, during his lifetime, is not of that absolute character which the legislature cannot control. If it were, every change of the law of descents, would be an invasion of the rights of expectants under the existing law. A descent cast by the death of an intestate, cannot be disturbed by subsequent laws; but that is no reason why the legislature should not change the law, or give to individuals new capacities of inheritance. The security of existing rights remains inviolable, notwithstanding this is often done. By the death of H. Stephenson, before the act of 1785, his property passed
 
 
 
 c
 3 Henn. & Munf. 228. in note. to his legitimate child. If, under that act, the appellants were legitimated, in 1787, they, thereby, could not prejudice the rights of Richard. Their new capacity was altogether prospective. From that day, they enjoyed a character to inherit rights which might thereafter accrue; and, in relation to those rights, we do not see what bearing the time of their father's death has upon the question. In the case of Sleighs v. Strider, W. Hall devised land to his son, R. Hall, for life; and after to his eldest son and his heirs forever: but if no male issue, to his eldest daughter and her heirs. Bichard Hall had an illegitimate son born in 1776: in 1778 he married the mother, and recognised the son till his death, in 1796. He had also daughters after the marriage. It was determined that the son was legitimated, by the act of 1785, and entitled under the devise from his grandfather. It would seem, from the dictum of Judge Roane, that if Richard Hall had died before the 1st of January, 1787, the grandson never could have been legitimated. Whether he could or not, the eldest daughter must have taken. But suppose that the grandson had lived until 1788, and, in the lifetime of his father, had died leaving issue: would such issue, or the eldest daughter of Richard, have taken under the devise? We maintain that the issue of the deceased son would have taken: from which we infer that the time of death is immaterial. The interpretation of the Virginia Courts can only be made rational and intelligible by rejecting the limitations suggested by the Chancellor and Judge Roane, and applying the statute to all persons within its literal meaning, without reference to the time of the recognition, or the death of the father. By this course, the new capacity, in all, will take date from the 1st of January, 1787, and will confer rights from that day only; as in cases that have arisen since the statute, the legitimate rights of the children, born before marriage, all take date from the marriage, without any reference to the time of recognition, or the death of the father.
 
 
 
 5
 2. We insist that the appellants, being the bastard brothers and sisters of Richard on the part of the mother, are his heirs at law. The law of 1785 contains this provision: 'Bastards also shall be capable of inheriting and transmitting inheritance, on the part of the mother, in like manner as if lawfully begotten of such mother.' In adopting a rule for the interpretation of this provision, we insist, in the language of the court, in the case of Stones v. Keeling,d that 'the act relates to the disposition of property only; and proceeds to show who shall be admitted to share the property of a person dying intestate, notwithstanding any former legal bar to a succession thereto; and in that light the law ought to receive the most liberal construction; it being evidently the design of the legislature, to establish the most liberal and extensive rules of succession to estates, in favour of all, in whose favour the intestate himself, had he made a will, might have been supposed to be influenced.' It gives to bastards a full
 
 
 
 d
 3 Henn. & Munf. 228. note. and complete capacity of inheritance, through the maternal line, both lineal and collateral. By nothing short of this can the terms of the law be satisfied. It is said, however, that the terms of the law are fully satisfied when it is extended to inheritance direct, between the bastard and the mother; thus excluding collateral descents between bastards altogether. This doctrine is founded upon an entirely erroneous rule of construction. It is assumed that the statute being an innovation upon the common law, must be construed strictly, and extended only so far as the letter absolutely requires. The Virginia Courts, in the cases referred to, have adopted a different rule; and a rule more consonant to reason and justice, and to our free and equal principles of government. The incapacities of bastards grew out of the feudal system, and originated in the dispositions of the feudal lords to multiply escheats and forfeitures. Most undoubtedly it was the intention of the Virginia legislature, to cut up the whole system root and branch. If bastards cannot inherit from a legitimate brother, they cannot inherit from each other. Neither can they inherit from, or transmit inheritance to, uncles, grandfathers, or any collateral relative whatever. By the same rule, legitimate brothers and sisters cannot inherit from bastards, or their descendants. And if this be the case, who can say that bastards are capable of inheriting 'and transmitting inheritance, on the part of the mother, in like manner as if they had been lawfully begotten of such mother.' Mr. Doddridge, contra, stated, 1. that in examining the appellants' claim to hold the lands in question, as the legal representatives of Hugh Stephenson, under his will, he would contend, what indeed seemed to be admitted on the other side, that Richard Stephenson took by purchase from the State, and that Hugh never had an interest in the subject, legal or equitable, which he could devise, or which could pass from him in a course of descents. If this be so, it would certainly follow, that upon the death of Richard, under age and without issue, after having survived his mother, the estate passed from him to his heirs general, according to the letter of the act directing the course of descents, as the appellants' counsel contend, and without reference to the channel through which he obtained it. But we shall insist, that according to the equity of the 5th section of the act of descents, the land passed to the fraternal kindred.
 
 
 
 6
 One of the laws of Virginia on the subject of land bounties refers to them, as having been 'promised by ordinance of Convention.' This circumstance made a search for that ordinance necessary. There were three sessions of a Convention held in the year 1775. By an act of the last, the Convention of 1776 was regularly elected. The present controversy has had the effect of collecting the journals of both Conventions. They are now, for the first time, published. A perusal of them will show, that the Conventions, although they provided for raising troops, never made a promise of land bounty to any description of the public forces. Indeed, until they declared the State independent, they had asserted no claim whatever to the crown lands, such a promise would have appeared absurd. The first mention of a land bounty will be found in the acts of the first regular General Assembly at their October session in 1776, chapters 11. and 21. enacted after the death of Hugh Stevenson. The practice of giving bounties in land was followed up by the acts of October, 1778, c. 45, May, 1779, c. 6., and the manner of carrying them into grant was provided for by the acts of May, 1779, c. 18. and of October 1779, c. 21. But these laws having omitted to provide for the heirs of those who were, or should be, lost in the service, two others were passed. By the first a promise was made to the officers and soldiers, then living, in these words: 'and when any officer, soldier, or sailor, shall have fallen, or died in the service, his heirs or legal representatives shall be entitled to, and receive, the same quantity of land as would have been due to such officer, soldier or sailor, respectively, had he been living.'e The second is in the following words, (comprehending the case of H Stevenson:) 'That the legal representatives of any officer, on continental or State establishment, who may have died in the service, before the bounty in lands promised by this or any former act, shall be entitled to demand and receive the same in like manner as the officer himself might have done if living. It is observable, that the latter act only respects the heir of an officer who had fallen before any land bounty was promised
 
 
 
 e
 Chan. Rev. Code, 112. to any person; whereas the former is an encouragement held out to the living officer, soldier, and sailor, &c. By the latter act, it is evident that the bounty conferred by it was not given to those who died before any bounty was provided; nor to the legal representatives of those, on account of whose services the same was given, as such. The bounty is directly given to the legal representative for the loss of an ancestor; and is so much as the father would have been entitled to had he lived or fallen in the service, &c. Here, if the heir took quasi heir, the debts of his ancestor might sweep the gift away. The difference between pay and bounty cannot well be overlooked. The first is a vested estate, and, as such, subject to debts and legacies. Bounties to the widow or heir, are in the nature of compensation, or of gratuities for a loss, and are taken directly from the hand that gives. Hugh Stevenson had not, at the time of his death, even a promise of the bounty in question, nor of any other bounty. His services entitled him to his pay and subsistence alone.
 
 
 
 7
 It is difficult to comprehend what is meant by the opposite counsel, when he speaks of those 'whom by his will he had appointed to represent him, or to that class of relations among whom personal property was distributed by the statute of distributions.' As to the statute of distributions, it is enough to say, that then, as well as now, it no more embraced a bastard than the feudal law of descents. And as to the terms 'appointed by his will to represent him,' if they mean any thing, they mean the persons to whom the party had devised the property in question. But could Hugh Stevenson devise the property in question? Real estate in Virginia was never devisable at the common law. In 1776, the English statute of wills was in force. Under that statute, those only who were seised, could devise. The construction of that statute was the same in England and Virginia. Those lands only, which the testator had at the time of making his will, could be devised. The Virginia statute of wills empowers a party to devise such estates, real or personal, as the party hath, 'or at the time of his death shall have,' &c. This statute passed in 1785, and began its operation on the 1st of January, 1787. It is, then, obvious that the appellants cannot claim as devisees, neither at the common law, nor under the English statute of wills; nor even under the Virginia statute of wills, if it had been then in force; because neither at the time of making his will, nor at the time of his death, had the testator any interest in the premises.
 
 
 8
 2. The appellants claim as heirs at law to Richard, under the 19th and 18th sections of the act directing the cause of descents. The 19th section is in these words: 'Where a man having, by a woman, one or more children, shall afterwards intermarry with such woman, such child or children, if recognized by him, shall be thereby legitimated.' The issue also in marriages deemed null in law, shall, nevertheless, be legitimate. And the 18th section is in these words: 'In making title by descent, it shall be no bar to a party that any ancestor through whom he derives his descent, was, or shall have been, an alien. Bastards also shall be capable of inheriting or transmitting inheritance on the part of their mother, in like manner as if lawfully begotten of such mother.'
 
 
 9
 In the construction of statutes no authority need be quoted for the following rules of interpretation. 1st. All the acts passed at any one session of a legislative body are to be taken together as one act. 2d. Consequently, the same words or phrases, as often as they occur, are to be construed to have the same meaning when that can be given them without gross violation of the sense. 3d. The acts of the same session, made in pari materia, are to be taken together as one act. The marriage act, the act of descents, the statute of wills and distributions, and the act respecting dower, were made in pari materia. Marriage is the source of all legitimate birth, and, as such, the cause of dower, of descents, and of distributions. These laws have extraordinary claims to be considered as one statute. They were compiled at the same time, by the same committee, composed of the ablest lawyers and civilians of their country—enacted at the same session of the same legislative body, in the same year, (1785;) and, lastly, all went into operation at the same time, on the 1st of January, 1789. They will be found to contain a complete code for the government of domestic relations, without any contradictions or discrepancies. These four statutes contain 164 sections; in almost every one of which the future verb shall occurs, and in all of which, with the exception of the 7th section of the marriage act, (which confirms past irregular marriages,) its future operation cannot be disputed, nor never has been disputed.
 
 
 10
 With the rules of construction already stated, and this view of the four statutes, we will proceed to show, that the appellants' construction of the 19th section is incorrect. And this, 1st, on principle, and, 2dly, on authority. First. The rules of construction entitle us to give to the verb shall, in this section, the same meaning intended whenever it occurs in any of the statutes. If the legislature had intended to confer legitimacy on those recognized before the 1st of July, 1787, they certainly would have left us nothing for construction. They would not have been less cautions than in the preceding section they had shown themselves on a less important subjec; 'is or hath been an alien,' &c. Again; it is the obvious policy of a just legislature, that this act should operate prospectively, not retrospectively. Words which might bear both constructions, ought to be expounded according to that policy; to give a statute a retroactive effect without evident necessity, is inconsistent with this policy. To give to this act an operation upon past births and marriages, is to carry the liberality of construction far indeed. But to cause it to operate on the past recognitions of the father who is dead, before the commencement of the statute itself, would be unjustificable. The principle of the law is, that after marriage, the father, if he pleases, may render his children legitimate. Legitimation, in this view, is the effect of the father's agreement; an effect of which he must be sensible, to make it his act. It is easy to conceive of cases in which a father, willing to soothe his wife, and make the best of his case, might be brought to say that her children, born before their marriage, were his, at a time when such acknowledgment would have no legal effect whatever; but who, with the provisions of this statute before him, would make such an acknowledgment; an acknowledgment which would make the child his heir, and pledge him to the mother and the world to provide for it as such: To construe the act as having a retrospective effect on past recognitions, would, therefore, be against the general policy of legislation; contrary, often, to the wish of a deceased individual; and might be productive of much injury to private rights.
 
 
 11
 But, it is said, that the possible interest which children have in the property of their father in his life time, is not of that absolute character which the legislature cannot control. This is admitted, and the statute of descents is an exercise of such a control. But the new rule of descents created by that act, is known to the proprietor in his life time, and if that pleases him not, the statute of wills, of the same date, is placed in his hands, and enables him to control the act of descents. Again; it is a maxim that nemo est haeres viventis. In life, the relation of father and child exists between legitimates, but not between illegitimates. The relation of ancestor and heir, presumptive or expectant, may exist while the former is still living. But the legal relation of ancestor and heir never does exist until the death of the father. The moment the eyes of the father are closed in death, is that in which this legal relation begins to exist, and from that time it becomes unalterable. So, after his decease, Hugh Stephenson became ancestor to Richard in ventre sa mere; but not the ancestor of the appellants.
 
 
 12
 To examine the 19th section upon authority. The cases of Rice et al. v. Efford et al.f and of Stones v. Keeling, and Hughes v. Striker,g are all that bear upon the subject. The only question which seemed to create much difficulty in those cases was, whether births and marriages, before the act, were embraced by it? and the decisions are, that such births and marriages are embraced, where the children, born before wedlock, had been recognized by the father, after the 1st of January, 1787. But this is said to be nothing more than an obiter dictum of Judge Roane. But we regard it as the reasoning of the Court, given by the only Judge who gave any reason for the decision. A decision, that marriages and births, before the act, are embraced by its provisions, because the recognition took place after the act was in force, is plainly a decision, that, but for the subsequent recognition, prior marriages and births could not be considered as within the act. These cases furnish good authority for applying the 7th section of the marriage act, to marriages contracted before, but existing on the 1st of January, 1787; and for substituting the words 'hath been,' in the act of descents respecting aliens, for the words 'shall have been.' If this be correct, both those provisions will accord with the residue of the acts containing them,
 
 
 
 f
 3 Henn. & Munf. 225.
 
 
 g
 Ib. and with the act concerning dower, and the statute of wills and distributions. The operation of all, will then be prospective.
 
 
 
 13
 The statute of descents shows, that wherever, in adopting the civil law, its framers meant to exceed or fall short of its provisions, they have done so in explicit terms. By the civil law, the marriage of the parents legitimated the children previously born, without the father's recognition.h This legitimation was the subject of the famous proceeding at the parliament of Merton. The ecclesiastics there demanded, that the marriage of the parent should legitimate the children; to which the barons returned their memorable answer: 'Nolumus leges Angliae mutari.'i The common lawyers of England, therefore, would not agree to adopt the civil law in this particular. But the common lawyers of Virginia, who compiled the act of 1785, determined to adopt the civil law in this particular, sub modo; that the marriage of the parents should legitimate the children, provided the father should afterwards recognize them. It is contended, on the other side, that this recognition is nothing more than statutory evidence of the fact, which might be otherwise proved, and is not of itself a substantive provision. If this argument be correct, then by the common and civil law a bastard must always have been the heir of his natural father, provided the identity of that natural father could be proved. But as we know that the mother, both by
 
 
 
 h
 1 Bl. Comm. 455. Just. Inst. l. 1. tit.
 
 
 i
 1 Bl. Comm. 455. the common and civil law, was always a competent witness to establish that fact of the father's identity, and yet never resorted to for the purpose of making her child heir to the father, we have a right to conclude, that the recognition required by the statute, is something more than mere evidence of the fact.
 
 
 
 14
 3. The appellants claim as heirs of Richard Stevenson, under the 18th section, and in support of this claim they contend, that the terms, 'inheriting or transmitting inheritance on the part of the mother, in like manner as if they had been lawfully begotten of such mother,' confer a capacity to inherit and transmit inheritance in the ascending as well as descending line, and also from and among collaterals. Their doctrine amounts plainly to this: that by the true construction of the second member of the 18th section, bastards are made the legitimate children of their mothers, at least for the purposes of inheritance.
 
 
 15
 In expounding the statute of descents, it has been justly remarked by Judge Tucker, that the framers of it were eminent sages of the law, and complete masters of its technical terms. This being the case, it would be reasonable to look for the same technical language, in all cases where the same thing was intended. When in the 19th section of the act of descents, and also in the marriage act, they remove from certain classes of bastards all the disabilities under which they laboured, they employ that legal term which conveys their meaning clearly, and leaves nothing for construction. They say they shall be 'legitimate,' not that they shall be capable of inheriting 'on the part of their mothers and fathers;' leaving us to inquire after the extent of the capacity. The law causes them to change characters. They cease to be bastards, and become the legitimate children of their father and mother. The consequences of their legitimacy follows. They have father and mother, sisters and brothers, uncles and aunts, with an universal capacity of inheriting and transmitting inheritance. The 18th section immediately preceding, if it had been intended to make bastard children the legitimate offspring of their mothers, would have followed the same language, and would have left nothing to interpretation. That section would have read thus: 'In making title by descent, it shall be no bar to a party, that any ancestor through whom he derives his descent from the intestate, is, or hath been an alien or a bastard. Bastards also shall be considered in law as the legitimate children of their mother.' The 19th section, like the marriage act, gives no new capacities to bastards as such. They make certain persons of that description legitimate, and the capacities of legitimacy follow of course. They inherit to both parents, not as bastards, but as their legitimate offspring.
 
 
 16
 The second proposition of this argument is, that all the disabilities of bastardy are of feudal origin. With us it is of Saxon origin. The term bastard being derived from a Saxon word, importing a bad, or base, original. The disabilities of bastardy are the same under the civil as under the common law, and in all ages and nations.j He has no ancestor; no name; can inherit to nobody, and nobody to him; can have no collaterals nor other relatives except those descended from him. He can have no surname, until gained by reputation. This is the origin of new families. He is the propositus by common law. But by the civil law he can inherit his mother's estate.k She is, therefore, the propositus of the civil law. Collaterals descended from a male relative are by the civillaw termed agnati; those descended from a female relative cognati.l In a note to Cooper's Justinian, which I take to be from the pen of Sir Henry Spelman, it is said that illegitimate children can have no agnati—Quia neque gentem neque familiam habent.m If for this reason they can have no agnati, it follows that they can have no cognati; and this is the reason of Justinian's broad proposition, that bastards can have no collaterals; which is our doctrine in this case.
 
 
 17
 It is admitted that the 18th section does not give legitimacy except specially for inheritance; that is, it removes that incapacity, and no other: finding and leaving them bastards. Now, there are no other disabilities except the incapacity to inherit or to hold a church dignity.n And since these dignities do not exist in the United States, if it had been the intention of the legislature to place the bastard on the footing of a lawful child of his mother, for the purposes of inheritance, and thus to admit him among collaterals in her line, it is inconceivable why they should not have said at once, that bastards shall be considered in law the legitimate children of their mother. Instead of which, they have used a technical term, ex parte materna; which in the civil law is constantly opposed to this other term, ex linea materna. The first importing a capacity of lineal inheritance; the other, that, and collateral inheritance also. Neither by the common nor civil law could she inherit to her child, even chattels; she is not mother for inheritable purposes by either code; and the 18th section has given her no inheritable blood of her child. Being incapable of inheriting herself, she cannot give inheritance to a legitimate child by the civil law; because, by one of its canons, the child can never succeed by representation or succession, where the parent could not.
 
 
 18
 So far, therefore, is the assertion, that the heritable disabilities of bastardy are of feudal origin, from being correct, that they were known and enforced from time immemorial in all nations; were known and emorced in England, before the Norman sat foot there. The Ecclesiastics at Merton did not demand of the king that bastards should inherit even to their mother. They simply demanded, that by the intermarriage of their parents they should become legitimate; which was refused.
 
 
 19
 But it is contended by the appellants' counsel, that the words, 'in like manner as if lawfully begotten of such mother,' apply as well to collateral as lineal inheritance. But what is that which a bastard has capacity to do, 'in like manner as if lawfully begotten of his mother?' The answer is in the words of the statute, 'of inheriting and transmitting inheritance on the part of his mother.'
 
 
 20
 But, we insist, that although Richard Stevenson, the son, took by purchase from the State; yet he took quasi heir, to hold as such to the use of his male anceastry, under the equity of the 5th section of the act of descents: 'Provided, nevertheless, that where an infant shall die without issue, having title to any real estate of inheritance derived by purchase or descent from the father; neither the mother of such infant, or any issue which she may have by any person other than the father of such infant, shall succeed to, or enjoy the same, or any part thereof, if there be living any brother or sister of such infant on the part of the father, or any brother or sister of the father, or any lineal descendant of either of them.' The principle of this section is, that the estate which came from a male ancestor, shall return to his stock. The principle of the 6th section, immediately following it, is the same; that the estate which came from a female ancestor, shall return to her stock. It is admitted, that the case of Richard Stevenson is not within the letter of the 5th section; but is it not within the equity of it? The estate came not from the father by descent, or by gift; but in equity we may pursue the consideration of the grant, and have a right to inquire, whether that consideration was furnished in common, by the paternal and maternal kindred; and, therefore, ought to pass to both lines. The consideration of the grant to Richard Stevenson, is his father's military service, and his death in that service. Loss is a valuable consideration for a grant, and the grant ought, in consequence, to be made to the heir of the family suffering the loss. A military bounty is in the nature of compensation for a loss, or of a gratuity for services. It is intended to supply to a family, as far as the liberality of the country can supply the place of a lost member. They are intended to avail the heir in his pecuniary concerns to the extent to which it is supposable his father's labour might have availed him had he lived. In this view, therefore, the hounty, given by law to the heir, is, in equity, a paternal estate, and should descend and pass to the paternal kindred, in exclusion of the maternal.
 
 
 21
 The Attorney-General, on the same side, contended, that the appellants were not entitled, either as legal representatives of Hugh, or as heirs of Richard Stevenson.
 
 
 22
 1. The appellants were not the legal representatives of Hugh Stevenson; for legal representatives are those whom the law appoints to stand in a man's place, and such was not the case of the appellants. The law recognized no connexion between them and Hugh Stevenson.
 
 
 23
 But, it is objected, that the father had made them his legal representatives by his will. This admits of various answers: but one is sufficient, that the will was a nullity; it was revoked by the subsequent marriage and brith of a child.o Neither, therefore, by operation of law, nor by any act of Hugh Stevenson, does it appear that the appellants were his legal representatives.
 
 
 24
 2. Neither could they inherit as heirs to Richard Stevenson; for, being natural children, there was no common blood between them.
 
 
 25
 It is again objected, that they were legitimated by the 19th section of the law of descents. But this clause has received a judicial exposition by the highest Court of the State, in which the law was passed, and is now the settled law of that land. In the cases of Rich v. Efford,p and Sleighs v. Strider,q the Court of Appeals of Virginia decided, that the act applied to cases of prior births and marriages; but, that to give it an application, the father must have been in life after the passage of the act. In this case, the father had died more than ten years before the act took effect, and, consequently, the case at bar is not within its operation. But, it is said, that the Court of Appeals were right in extending the law to cases of births and marriages antecedent to the act; but they were demonstrably wrong in declaring, that the act applied to cases only in which the father had died posterior to the act. To which we answer, that the precedent cannot be divided; if it is to have the authority of a precedent, it must be taken altogether; it cannot be entitled to the authority of a precedent so far as it favours the opposite side, and be open to dispute so far as it destroys their position. It has been the settled law of Virginia, since the year 1805; for it was then that Sleighs v. Strider was decided, and though its correctness may have been originally doubtful, yet extreme inconvenience follows the disturbance of a rule of property which has been so long settled; and that this argument ab inconvenienti, was of great weight in the estimation of the Court of Appeals itself, may be seen from the proposition to reconsider the decision of that Court in the celebrated case of Tomlinson and Delland.r The original decision in that case, which subjected the succession to personal property, to the feudal principle, which, in relation to lands, respected the blood of the first purchaser, had been made in 1801. It having produced great excitement in the State, and being very generally disapproved, a reconsideration was most strenuously pressed in 1810, nine years only after the original decree; but a majority of the Court was of the opinion, that the inconvenience of overthrowing what was already considered as a settled rule of property, was too great to be encountered, even if the decision were erroneous at first. It is true, that they thought the decision called for by the stern language of the law; but from one of the Judges this opinion was wrung with such manifest reluctance, that it was believed he would have come to a different result had the question heen res integra. Here the rule having been settled, the Court will say how far it ought now to be considered as the settled law of the State.
 
 
 26
 If, however, these precedents be open to question at all, they are open throughout; and if the Court of Appeals erred at all, it was not in limiting the operation of the law to cases in which the father has died since the act took effect, but in extending it to cases of births and marriages which happened anterior to the passage of the law. This law took effect on the 1st of January, 1787. The births, the marriage, the recognition, and the death of the father, had all occurred in, and prior to August, 1776. Had the legislature of Virginia the right to pass a retrospective law? The Court of Appeals said not, in the cases of Turner v. Turner's executors,s Elliott v. Lyell,t and the Commonwealth v. Hewitt.u Even where it has been attempted to apply a new remedy to pre-existing rights, it is said the language must be irresistibly clear, or the Court will not give it such retrospective operation.
 
 
 27
 Does the language of this act clearly intend to operate on pre-existing facts? on pre-existing marriages and births? We contend that it does not. In the case of the Commonwealth v. Hewitt, before cited, Judge Roane, in resisting the retroactive effect of the law, founds himself, in a great measure, on the general nature of laws, as prospective, and on the time assumed by the act itself for the commencement of its operation, from and after the passing thereof. Both considerations concur here, with this farther circumstance in favour of this law, that while it has (in the original act) the usual clause, 'This act shall commence in force from and after the passing thereof,' a subsequent and distinct law was passed to suspend its operation until the 1st of January, 1787. Again; this act commences with a general declaration, most unequivocally prospective. The first clause is, 'be it enacted by the general assembly, that henceforth, when any person having title, &c.' According to settled rules of construction, therefore, the force of this expression, henceforth, runs through every subsequent clause. The 19th section under consideration ought to be read thus: 'Be it enacted that, HENCEFORTH, [that is, after the 1st of January, 1787,] where a man, having by a woman, one or more children, shall, afterwards, intermarry with such woman, such child or children, if recognized by him, shall thereby be legitimated.' Is this language so irresistibly retrospective, in relation to the date of the law, that the Court is constrained to give it that construction? Is it not, on the contrary, so obviously future and prospective, that it requires subtility and violence to wrest it to a retrospective meaning? The verbs which indicate the acts that are to produce the effect of legitimation, are in the future tense. It is insisted, therefore, that the clause has no application to any case, but to one in which all the facts on which it is to operate, shall happen after its passage; the birth of the children, the marriage, and the recognition. It is true, that in speaking of the children, the present participle is used, 'having one or more children.' But the present tense of this participle relates, not to the time of passing the act, but to the time of the marriage, 'having,' at the time of the marriage, 'one or more children.' This is not a new use of the present tense; grammarians tell us that the present tense is occasionally used to point at the relative time of a future action. The true reading of this part of the act is this, 'where' (i. e. in all cases, hereafter, in which) 'a man shall marry a woman, having by him, at the time, one or more children.' Thus, the participle, although present at the time of the marriage, is future in relation to the passage of the act. This is no unusual application of this participle;—if I say, 'if a man shall go to Rome, and having a dagger in his hand, shall strike it to the heart of the Pope:' the present participle is properly used in it; it is present in relation to the action with which it stands connected, though future, in relation to the time of speaking. So the present participle here is present in reference to the act with which it clearly stands connected, the act of marriage; although future in relation to the date of the act. The sense is the same as if the legislature had said, 'wherever, hereafter, a man shall have one or more children by a woman, and shall, afterwards, intermarry with her,' &c. It is only by this construction which considers both the birth and marriage as future, that the word 'afterwards,' used in the act, acquires a grammatical sense, or, indeed, any kind of sense. To prove this, let us see what the effect will be of considering this participle, as used in the present tense, in reference to the time of passing the act. Then the sense will be, 'where a man now having one or more children by a woman, shall afterwards intermarry with her:' it is clear that the word, afterwards, becomes insignificant and senseless. It adds nothing to the meaning; for if a man now having one or more children by a woman, shall intermarry with her, he must of necessity intermarry with her afterwards; for the future verb, shall intermarry, makes the act future, in relation to the passage of the act; and the adverb of time, afterwards, added to the verb, does not perform its appropriate function of adding a new quality to the verb. It is a useless clog, therefore, on the sence, because its tendency is to obscure, and not to illustrate the sense. Whereas, the construction for which we contend, (by considering both facts as posterior to the act, but the marriage as being posterior to the birth,) gives the word, afterwards, force and significancy; it then performs the office of arranging the order of the two future events. In this point we differ from the Court of Appeals of Virginia, and insist, that the liberality which would apply this act retrospectively, to previous births and marriages, is a liberality which looks beyond the judicial sphere, and belongs only to the legislature. What is the argument on which the Court of Appeals (and the opposite counsel, after them) ground themselves in extending this act to antecedent births and marriages? 'I see no difficulty,' says Judge Roane, in Rice v. Efford,v 'except what arises from the words, shall afterwards intermarry, which might seem to import only marriages to be celebrated in future: that word, afterwards, however, is rather to be referred to the birth of the children, than the passage of the act; and no good reason could possibly have existed with the legislature for varying the construction of a section, embracing two descriptions of cases standing on a similar foundation.' The counsel for the appellants, seizing this passage, has said, the terms, 'shall afterwards intermarry,' are correctly referred (by the Court) to the birth of the children, not to the date of the act. This is not accurate: it is not the three words, shall afterwards intermarry, that are referred by the Court to the birth of the children: but the word, afterwards, alone. This, we admit, is correctly referred to the birth of the children: but the Court having correctly gained this conclusion, forget the force of the future verb, 'shall intermarry.' We say, that the force of this future verb requires that the marriage shall be after the act. That henceforth, 'where a man having by a woman one or more children, shall afterwards intermarry with such woman,' irresistibly demands a marriage future to the date of the act: that the words, shall intermarry, make the marriage future in relation to the act. The word, afterwards, removes the marriage farther off, and marks its futurity in relation to another event, the birth of the children; which other event, although expressed by the present participle, is itself drawn forward into futurity by the force of the word, afterwards, to which it is attached. That such an intention is utterly inconsistent with the prospective character given to the whole act, by the force of the word henceforth, and in the commencement. That the force of this word runs through the whole act; and that, used in the clause under consideration, it would render the retrospective construction of that clause absurd. In the passage cited, Judge Roane says, that no good reason could possibly have existed with the legislature, for varying the construction of a section embracing two descriptions of cases, standing on a similar foundation. This might have been a good argument on the floor of the legislature, to induce them to embrace past cases; but it is no argument to prove that they have embraced them. Whether they ought to have embraced them is a very different question from whether they have actually done so. The first is purely a legislative question; the last purely a judicial question, and the only question in the case for the Court.
 
 
 28
 But it is said, the appellants do not seek to give the act a retrospective effect; they say that the act, from the time it took effect, clothed the appellants with a new capacity of inheritance, not in relation to rights previously vested, but in relation to inheritances which might thereafter fall. Let it be admitted that their position is such; let it also be admitted, that the legislature had the right to clothe them with such new capacity in relation to future inheritances. But the question still remains, have they done so: is it to persons in their predicament that this new capacity of inheritance is extended? We have endeavoured to show that it is not: whether the Court look to the exposition of the statute by the tribunals of the State, or whether they look to the construction of the statute, per se. The Court of Appeals of Virginia, while they admit the application of this statute to antecedent births and marriages, decide that the law applies to cases only where the father has died posterior to the passage of the statute. The reasoning on which the Court ground this distinction is not fully developed by them: the appellants' counsel infers their reasoning, and, as we may safely admit, contests it with success. But there is a reason for requiring that the father should continue in life after the act, which applies with equal force both to the marriage and the recognition, and corroborates the construction drawn from the language of the law, that both those facts should be posterior to the act. It is this: the statute attaches new legal consequences to the act of marrying a woman by whom the man had, previously, had children; and to the act of recognizing such children. Make the law prospective in those particulars, and the citizens for whose government it was intended, have it in their choice, by performing those acts thereafter, to incur those consequences or not. But attach those consequences to a past marriage and recognition, and you change the legal character of a past transaction by an ex post facto law. By a subsequent law you attach consequences to an act which did not belong to it when it was performed. It is precisely for this reason that ex post facto laws are prohibited; because consequences are attached to an act which did not belong to them at the time; and which, consequently, could not have entered into his consideration of the question, whether he would commit it or not. You surprise him by a new case, on which his judgment was never called to pass, and when it is too late to retract the step and avoid the new consequences.
 
 
 29
 3. The next ground taken by the claimants is, that if they were not legitimated by the 19th section of the law of descents, they were made capable of inheriting from Richard by the 18th section of that law.w It is contended on the part of the appellants, that this clause opens an inter-communication of blood through the mother, to an indefinite extent lineally and collaterally. But we insist, that it only gives to the natural children the faculty of inheriting immediately from the mother, and of transmitting such inheritance to their posterity. The legislature has not said, that natural children shall be considered as lawfully born of their mother for all the purposes of inheritance pointed out by the act. It has given them two capacities of inheritance only; the capacity to inherit on the part of the mother; and the capacity of transmitting inheritances on the part of the mother. These capacities, it is true, they are to enjoy, in like manner 'as if they had been lawfully begotten of the mother.' But these words, 'as if, &c.' do not add to the number of their heritable capacities; they seem only to designate the extent to which they shall enjoy the two specific capacities which are expressly given them.
 
 
 30
 Do these capacities authorize them to claim the inheritance from Richard? What are they? 1st. That they shall be capable of inheriting on the part of their mother; 2dly. That they shall be capable of transmitting inheritance on the part of their mother. The last capacity it is not contended, has any application to the case at bar. This not being the case of an inheritance transmitted through the natural children, but one which they claim directly for themselves. If they are entitled, therefore, their title must arise under the first capacity, that of inheriting on the part of their mother. What is the meaning of this expressin, on the part of their mother? The counsel on the other side contends, that it means from or through the mother; that it connects the bastard with the ancestral line of the mother, and through her, collaterally, with all who are of her blood. On the other hand, we insist, that the capacity does not go beyond an inheritance from the mother, and the transmission of that inheritance lineally and collaterally among their descendants; or, in other words, to make the mother the head of a new family. The expression 'on the part of the mother,' does not carry the mind beyond the mother, unless connected with words of more extensive significance, such as, ancestors on the part of the mother, or descendants on the part of the mother; and here it would be the supplemental words which would produce the effect, not the words, 'on the part of the mother.' But, it will perhaps be urged, that in the case of Barnitz v. Casey,x the counsel upon both sides, and the Court, seem to have understood this term in the sense contended for on the other side. That case arose on a statute of Maryland, in which the force of the term is expounded to mean, from or through. In our case, the Virginia statute furnishes an opposite inference. The expressions, 'on the part of the father,' and 'on the part of the mother,' occur in the 5th section of the law of descents. It is the only instance in which they do occur, and there they are indisputably synonymous with 'of' and 'from' any brother or sister of such infant on the part of the father, and no vice versa. It is said, that this provision places the natural children on the footing of legitimate children to all the purposes of inheritance. But, we would ask, does it enable the mother to inherit from them? Does it enable the mother's ancestors or collateral relations so to inherit? The provision is, that the natural children may innerit from the mother. But where is the provision that the mother may inherit from them, or that her relations may inherit from them? It is not to be found; the legislature did not look upwards beyond the mother. It was not their object to force her natural issue upon a family which she had dishonoured and offended by bringing them into the world. That they should have connected them with her was just and proper; she could not complain. But to have connected them with a family from which she had probably been expelled on account of her infamy, and to have given them a capacity to inherit the estates of that family, would not have been quite so just or reasonable. We contend, that the legislature have not done it; but that the capacity to transmit applies only to inheritances descending from the mother, and from each other. Again; if the expression, 'on the part of the mother,' is of the extent contended for, then the capacity to inherit on the part of the mother, is a power to take inheritances from, or through her, in right of her. But the inheritance claimed is not of this description; it is a direct inheritance from a mother, which, both at the common law, and under the statute, is not an inheritance on the part of the mother; it does not come from, or through her, it does not come in her right. So say the Court in the case of Barnitz v. Casey, before cited.y That was on the statute of Maryland; the statute of Virginia, in case there is no father, gives the estate to the mother, brothers and sisters, per capita, so that the shares taken by the brothers and sisters, are cast at once from the deceased brother on them, and do not come to them, from, or through, or in right of the mother. This is the inheritance which the appellants claim, and which they claim in virtue of their specific and single capacity to inherit on the part of the mother.
 
 
 31
 Mr. Hammond, for the appellants, in reply, stated, that the argument on the other side, involved the general construction of the act, as well as its operation upon this particular case. It asserts, that the recognition must, in all cases, be subsequent to the marriage; thus proving the consent of the father to the legitimation. Now, if the legitimation does not result from the agreement, or depend upon the assent of the father, this argument is of no avail. The principle is adopted from the civil law. And it is reasonable to suppose, that when the ablest lawyers and civilians of the country, introduced it into their code, they intended to adopt it as interpreted and understood in the countries where it prevailed. The civilians held, that 'this legitimation is a privilege or incident inseparably annexed to the marriage, so that, though both the children and parents should wave it, the children would, nevertheless, be legitimate.' The foundation of this doctrine is thus explained: 'Ratio est quia matrimonium subsequens ex fictione legis retrahitur ad tempus susceptionis liberorum ut legitimati habeantur legitime suscepti (i. e.) post contractum.'z
 
 
 32
 If legitimacy is an incident inseparably annexed to the marriage, it must be the marriage, and not the agreement of the father, that legitimates the child. But there can be no such legitimacy without the agreement or recognition of the father. Agreement and recognition are not synonymous terms. Recognition implies no more than a simple admission of a fact; it is in the nature of evidence. Agreement supposes an assent or compact, from which certain consequences result, made with a view to those consequences. Recognition refers to something past. Agreement implies a transaction from which some effect is to follow. The provision under consideration consists of an enumeration of facts, and a declaration of legal consequences resulting from those facts. The facts are, having children by a woman, and afterwards marrying her. Upon such a case the statute operates, and declares the children legitimate. But the effect follows only the legal proof of the facts; and this the statute has defined. There must be a recognition by the father; and this is considered a third fact. Though as a fact it must exist; yet its existence is only necessary to establish the first fact; that the husband of the mother is, in verity, the father of the child. No legal consequences can result, until facts are established by proof. We insist, that the terms 'if recognized by him,' are inserted for the single purpose of defining the proof upon which the material facts should be established, and are to be regarded only as prescribing a rule of evidence for the particular case. Had the legislature intended this recognition as one fact, a principal condition upon which the legitimacy was to be founded, they could easily have connected it with the other facts, so as to have left no doubt about it. The act would have read thus: 'Where a man, having by a woman one or more children, shall afterwards intermarry with such woman, AND recognize such child or children, they shall thereby be legitimated.' As the words now stand in the sentence, they are of very different import. The two principal facts are first enumerated; then proceeding to declare the result, the mode of proof is set down, as it were, in a parenthesis, hypothetically, and indefinite as to time: As much as to say, 'when the father and mother intermarry, if, suppose that, allow that the father recognized the children, they shall be legitimate.' If the recognition of the father is a principal fact; if the legitimacy is the consequence of that recognition, the child could only be legitimate from the time of the recognition. This would introduce endless confusion and litigation. The rights of parties would always depend upon the time the father signified his assent, or declared his agreement. This never was the doctrine of the civil law. Some referred the legitimation to the birth, others to the time of marriage; but all dated it from the one or the other of these periods. But as legitimation could not exist until the celebration of the marriage, we hold that it must commence at that time, and from that time confer rights upon the parties. A recognition before marriage is within the letter of the act. It supplies evidence as conclusive of the fact to be established, as if made after the marriage. Constantine, who introduced this provision into the civil law, 'is supposed to have intended it as an encouragement to those who had children born in concubinage, to marry the mother of such offspring.'aa But in our case, the recognition is in fact subsequent to the marriage. The will speaks only from the death of the testator, and is, therefore, a recognition by him at the time of his death. The appellants were born illegitimate. Their father recognized them as his children. While illegitimate, he declares their mother his wife. He afterwards marries her, and continues to recognize them as his children. He dies. Then comes an act of the legislature, the special object of which is, 'to protect and provide for the innocent offspring of indiscreet parents, who had already made all the atonement in their power for their misconduct, by putting the children whom the father recognized as his own, on the same footing as if born in lawful wedlock.' If birth and marriage are the facts upon which the act operates, and recognition nothing but evidence of those facts, the decisions already cited are decisive in our favour. It is settled, that the act extends to cases of birth and marriage before its passage; and it is perfectly clear, that the enacting part of the act is prospective. The parties upon whom it is acknowledged to operate, could claim no rights, but those which accrued after the first of January, 1787. It was at that period, and not before, that their new capacity commenced. We have shown, that this interpretation of the act interferes with no vested right: And we have shown how interests in possession may be affected, upon the principle decided in the Virginia Court of Appeals. In the view we take of the case, the death of the father, before the passage of the act, is a circumstance of no importance. It is upon the children, and not upon the father, that the act operates. It attaches upon existing cases, and gives a character to transactions already past. Were he alive, he could not recal the birth, the marriage, or the recognition. A solemn disavowal of the children could not restrain the operation of the law; for we have shown, that legitimation results from the facts, and not from the inclination or pleasure of the father.
 
 
 33
 The common law rules of succession, both as to real and personal estate, were exceedingly narrow and illiberal. Where those rules have been enlarged by statute, Courts have always given the act a liberal interpretation in favour of the persons let in. Thus the English statute of distributions was construed to extend to cases of intestacy that happened before its passage, where administration was granted afterwards.bb No vested right was disturbed by this interpretation, though it allowed the act a retrospective operation. So in our case, though legitimated by a law subsequent to their birth, the appellants claim a new capacity, only in regard to inheritances that may fall after their legitimacy takes effect. The appellants do not seek to make themselves heirs to their father Hugh. They claim that, upon the death of their brother Richard, in 1796, they were his heirs at law. In making title by descent from a brother, the father is not noticed at the common law. The descent is held to be immediate between brothers. So, by the laws of Virginia and Kentucky, where the father and mother are both dead, the descent is cast directly to the brothers and sisters. If this position could at any time have been doubted, it is now settled by the decision of this Court in the case of Barnitz's Lessee v. Casey.cc
 
 
 34
 But if the appellants were not legitimated by the 19th section of the act, they claim that they are entitled, as bastards, under the 18th section. When it is admitted that the act changes the condition of bastards, the extent of that change must be ascertained. By determining the class of cases included, it can be best decided what cases are excluded. The Court are called upon for the first time to put a construction upon this part of the act; and we hold, that it will not be correct to say, that bastards cannot inherit collaterally, without showing that the terms and policy of the law can be fairly satisfied, and collateral inheritance between bastards denied. The Court must say that the act confers nothing but a direct lineal succession between bastards and their mother; or they must say that the act removes entirely their incapacity of inheritance through and from the maternal kindred. To this last position it is objected by the counsel for the respondent, that it makes bastards the legitimate children of their mother for purposes of inheritance, which ought not to be done; because if such had been the intention of the legislature, they would have said so in express terms. But does it follow, that the capacity of inheritance would follow the express legitimation of bastards, without providing that such should be the consequence of legitimation? Children legitimated by the marriage of their parents, are no longer bastards. But bastards legitimated in the maternal line, would still, in law, be without a father, and that badge of illegitimacy must ever attach to them. It was a maxim of the civil law, that the Prince could legitimate bastards; but the civilians held, that such legitimation did not confer the right of succession.dd It was the right of succession, the capacity of inheriting and transmitting inheritance, that the legislature in this case meant to confer; and they have chosen to do it in express terms. There is no room to doubt what was intended; and we think there is no just foundation for the exceptions and limitations set up by the respondent.
 
 
 35
 We admit distinctly, that the appellants must take as bastards, or they cannot take at all. They are 'clothed with all the attributes and disabilities of bastards, except the capacity of inheritance, specially conferred on them, and conferred on them too as bastards.' What were the disabilities of bastards at the time the act was passed? They could not inherit. In matters of succession and inheritance, they had no mother, and consequently could have no other relative. But except on the single subject of inheritance, the laws recognised and regarded them as standing in the same relation to their kindred as if born in wedlock. In contracting marriage, bastards were held to be relations, and prohibited from marrying within the Levitical degrees. In the case of Haines v. Jeffell, the Court of King's Bench refused a prohibition, to stay proceedings in the Spiritual Court against Haines, for marrying the bastard daughter of his sister.ee And the Court said it had always been held so; especially where it was the child of a woman relative. Here the law expressly recognizes the collateral kindred between the uncle and his bastard niece. Bastards are within the marriage act, which requires the consent of parents or guardians to the marriage of persons within age.ff In this case, Mr. Justice Buller declares that the rule that a bastard is nullius filius, applies only to cases of inheritance, and says it was so considered by Lord Coke. Even Blackstone, who is quite a zealot for the common law doctrines respecting bastards, admits, almost in terms, that bastards were, at the time he wrote, subject to no disability but the incapacity of inheritance.gg And Woodeson asserts the same thing.hh In passing the act, the legislature meant to effect a change in the legal condition of bastards, by removing, to some extent, the only legal incapacity to which they were subject: and this was a total disqualification to inherit or transmit estates, from or to ascending or collateral kindred. It is, therefore, evident, that the legislature contemplated confering this capacity, in respect to the ascending or collateral kindred, or both. The civil law distinguished bastards into four classes. Those born in concubinage succeeded to the effects of their mother and relatives, and in some cases to a part of the estate of their putative father.ii So that the authority of precedent is against the doctrine of the respondent, which would limit the effect of the act to inheritance direct between the mother and the bastard.
 
 
 36
 But it is urged, that the appellants cannot inherit collaterally, because, legally speaking, bastards have no collateral relations; and therefore the appellants cannot be the brothers and sisters of Richard. This was true before the passage of the act. But does it remain so since? The law then provided, that so far as inheritance was concerned, a bastard was the son of no person. He had neither father nor mother, and, consequently, had no blood to convey succession except in a lineal descent from himself. There was no blood to convey succession, either to ascendants or collaterals. Having in law no mother, there could be no source from which a bastard could derive inheritable blood, and no channel through which his blood could communicate with that of others. But as this was a provision of positive law, a new provision could restore the connection. Such is the effect of the provision under consideration. 'Bastards also shall be capable of inheriting, and transmitting inheritance, on the part of THEIR MOTHER, in like manner as if lawfully begotten of such mother.' Henceforth there shall be heritable blood between the bastard and the mother. The bastard has thus a legal mother; and having a mother, a channel is opened through which he can have brothers and sisters, and every other relative in the ascending and collateral line. It was because the bastard had no mother, that he could have no brothers and sisters. The act gives him a mother. He can inherit from, and transmit inheritance to her direct. Heritable blood can flow from the mother to her bastard child, and be traced from the child to the mother, and through the mother to brothers and sisters, and uncles and aunts. The bastard is not legitimated: But his blood is made heritable through that parent about whom there can be no doubt. The character of his blood being changed, he is restored to his kindred in matters of inheritance; the only case in which the law separated him from them. It is true that the appellants were not the brothers and sisters of Richard at the time of his birth, as far as concerned inheritance. But the act of 1785 has effected a change in their condition; and from the day it took effect, they were in law, and for the purposes of succession to estates, his brothers and sisters of the half blood. Had Richard left brothers and sisters of the whole blood, the 15th section of the act would expressly embrace their case. There was no occasion to make express provision for the succession of bastards, either in the law of descents, or in Judge Tucker's table, because the general provision for the half blood included their case. This is clearly the mode of succession contemplated. They shall inherit in like manner as if lawfully begotten.
 
 
 37
 It is argued that, on the part of, are technical terms of the law, which only import immediately from. The operation of the act is thus limited to a descent immediately from the mother. If we are mistaken in the consequence, which we suppose even this intercommunication of blood must work in the legal condition of a bastard, we must still inquire whether the terms of the act can be satisfied by this narrow construction. We do not admit that the terms, on the part of, import no more than immediately from. We insist that they are used to describe the ancestral kindred in the line of each parent. On the part of the mother, means, from or through the mother, or her relatives. Thus, brothers and sisters of the same mother, but different fathers, are brothers and sisters on the part of the mother, and are described as such in the 6th section of the act. And in the case of Barnitz's lessee v. Casey, before cited, the counsel upon both sides, and the Court, seem to have understood these terms in the sense we contend for. The capacity of transmitting inheritance, conferred by the act, can have no operation, if the terms, on the part of, be interpreted to mean, immediately from the mother. The bastard must transmit the inheritance to or through, whether it pass to ascendants or callaterals.
 
 
 38
 The common law disabilities of bastards are, like the canons of descent, of feudal origin: for it must be remembered that this disability relates entirely to inheritance. Escheats are the fruits and consequences, as Blackstone says, of feudal tenure resulting from the frequent extinction of heritable blood, according to the feudal tenure of inheritance. A bastard, being the son of nobody, could have no heritable blood, consequently none of the blood of the first purchaser. The feudal doctrine of carrying the estate through the blood of the first purchaser, inevitably excluded inheritance among bastards. In this sense the disability of bastards was the consequence of feudal policy, and totally inconsistent with the liberal and equitable canons of descent, introduced by the act of 1785. The preference of the male ascending line, preserved by the statute of 1786, is not founded upon feudal doctrines. The inheritance is directed first to the father; not because he is the most worthy of blood, but because he is the head of the family, who can best dispose of the estate among his surviving children: And upon this same principle the grandfather is preferred to the grandmothers and aunts. This is no preference of the male ancestors; but simply a preference of the husband or father, if in existence, to the wife or children of the same person; and the principle of this doctrine is directly repugnant to that of the feudal or common law. Corruption of blood by convictions for crimes, alienage, and bastardy, were three fruitful sources of escheats at the common law. The principle of extinguishing the inheritable blood, applied to each case. The first was cut up by the constitution of Virginia. The act of 1785 laid the axe to the root of the other two. Not by authorizing aliens to hold lands, or by legitimating bastards. In the one case it permits a citizen, claiming by descent, to trace his relation to an intestate through an alien. In the other, it confers a capacity of inheritable blood upon bastards. The object of both provisions is the same: to enable the kindred of the intestate to obtain the property he left, instead of rapaciously seizing it for the government. The act is clearly remedial, and should be construed liberally in furtherance of the object of the legislature, conformable to the opinions of the Virginia Courts already quoted.
 
 March 4th.
 
 39
 Mr. Justice WASHINGTON delivered the opinion of the Court.
 
 
 40
 It is admitted by the counsel on both sides, in their argument, with which the opinion of the Court coincides, that Hugh Stephenson, though the meritorious cause of the grant of this land, never took any interest therein, but that the right to the same vested in his son Richard, to whom the warrants issued, as the first purchaser. It is further admitted by the counsel, that the law of descents of Ohio, at the time when Richard Stephenson died, was not more favourable to the claim of the appellants than that of Virginia, which will be hereafter noticed; and they have, in the argument, rested the cause upon the construction of the latter law. The opinion of the Court, therefore, is founded on this law.
 
 
 41
 The appellants object to the decree of the Court below, upon the following grounds: 1. That the land warrants ought to have been granted to them as the representatives of Hugh Stephenson, designated as such by his last will.
 
 
 42
 2. That by the marriage of their mother with Hugh Stephenson, and his recognition of them as his children, they were legitimated, and entitled to the inheritance in this land as heirs to Richard Stephenson; if not so, then,
 
 
 43
 3. That, as bastards, they were capable of inheriting from Richard, who, they contend, was their brother, on the part of the mother.
 
 
 44
 1. The appellants' counsel do not contend, that their clients are entitled to this land, as devisees under the will of Hugh Stephenson; such a claim would be clearly inadmissible, inasmuch as the testator was not only not seised of the land at the time his will was made, but the law which authorized the grant of it, was not even then in existence. But they are understood by the Court, to insist, that the will so far operates upon the subject, as to name them the representatives of the testator, and to render them capable, as such, of taking under the act of assembly, which passed after the death of the testator. The act provides, that where any officer, soldier, or sailor, shall have fallen, or died in the service, his heirs or legal representatives shall be entitled to, and receive the same quantity of land as would have been due to such officer, &c. had be been living.'
 
 
 45
 This claim is altogether fanciful and unfounded; for, in the first place, the appellants were not appointed by the will to be the general representatives of the testator, but the devisees, together with their mother, of all the testator's property; and, 2dly, if they had been so appointed, still it could not confer upon them such a description as to entitle them to take under the act of assembly, unless the act itself described them as the legal representatives of Hugh Stephenson, for whose benefit the grant was intended; the then, they would have taken exclusively under the act, by force of such legislative description, and not under, or in virtue of the description in the will. It is not likely that the expression, 'legal representatives,' in the act, was meant to apply to devisees of deceased officers and soldiers for whom the bounty was intended, if they had lived, because, at the time this law was passed, there could not be a devisor of those lands under the general law. It is more probable that they were intended to provide for the case of a person who may have purchased the right of the officer or soldier to such bounty as the legislature might grant to him.
 
 
 46
 The next question is, whether the appellants were legitimated by the marriage of Hugh Stephenson with their mother, and his recognition of them as his children. This question arises under the 19th section of the act of 1785, directing the course of descents, which took effect on the 1st of January, 1787. This section declares, that 'where a man, having by a woman one or more children, shall afterwards intermarry with such woman, such child or children, if recognized by him, shall be thereby legitimated.'
 
 
 47
 There can be no doubt but that the section applied to bastards in esse, at the time the law came into operation, as well as to such as might thereafter be born. But it is contended by the counsel for the appellants, that the section is, in every other respect, prospective, not only as to the fact of legitimation, but as to the two circumstances of marriage and recognition, which entitle the bastard to the benefits of the law; and, consequently, that to bring a case within the operation of this section, both the marriage and recognition must take place after the 1st of January, 1787. On the other side, it is admitted, that the privilege of legitimation is not conferred upon a bastard prior to the above period; but it is insisted, that, as to the marriage and recognition, the law should be construed as well retrospectively as prospectively.
 
 
 48
 In the case of Rice v. Efford, decided in the Court of Appeals of Virginia,jj the marriage took place prior to the 1st of January, 1787, but the father recognized his illegitimate children, and died, after that period. The whole Court seem to have been of opinion, that the word 'afterwards' referred not to a time subsequent to the 1st of January, 1787, but to the birth of the children, and, therefore, that the marriage, though prior to that period, legitimated the children before born, if they should be recognized by the father. But, it was stated by Judge Roane, in giving his opinion, that the construction of the act applies only to cases where the father has died posterior to the passage of the act.
 
 
 49
 It is contended by the counsel for the appellants, that since, in the above case, the father recognized the children subsequent to the 1st of January, 1787, this opinion of Judge Roane as to the time of the recognition, was unnecessarily advanced, and is, therefore, entitled to no higher respect than what is due to a mere obiter dictum. Be this as it may, it is the uncontradicted opinion of a learned Judge upon the construction of a law of his own State; and is noticed by this Court, not upon the ground of its being considered in that State as of conclusive authority, but because it strongly fortifies the opinion which this Court entertains upon the point decided; which is, that, however the construction may be as to the inception of the right, it is clearly prospective as it relates to the consummation of it. And this prospective operation being given to the act, by requiring the most important condition upon which the privilege of legitimation is to be conferred, to be performed after the law came into operation, it is less material whether the marriage was celebrated before, or after that period. To render the past recognition of the father effectual to give inheritable blood to his children, who were then illegitimate, and incapable of taking the estate by descent, either from him, or from those to whom it should descend, would in some respects at least, partake of the character of a retrospective law. It would seem to be most reasonable so to construe the law, as to enable the father to perceive all the consequences of his recognition at the time he made it.
 
 
 50
 The 3d question is, are the appellants, as bastards, capable of inheriting from Richard Stevenson?
 
 
 51
 The 18th section of the law of descents, under which this question arises, is as follows: 'In making title by descent, it shall be no bar to a party that any ancestor through whom he derives his descent from the intestate, is, or hath been, an alien. Bastards also shall be capable of inheriting or of transmitting inheritance on the part of their mother, in like manner as if they had been lawfully begotten of such mother.'
 
 
 52
 In the construction of this section, it is never to be lost sight of, that the appellants are to be considered as bastards, liable to all the disabilities to which the common law subjects them, as such, except those from which the section itself exempts them. Though illegitimate, they may inherit and transmit inheritance, on the part of the mother, in like manner as if they had been lawfully begotten of the mother. What is the legal exposition of these expressions? We understand it to be, that they shall have a capacity to take real property by descent immediately or through their mother in the ascending line; and transmit the same to their line as descendants, in like manner as if they were legitimate. This is uniformly the meaning of the expressions, 'on the part of the mother or father,' when used in reference to the course of descent of real property, in the paternal or maternal line. As bastards, they were incapable of inheriting the estate of their mother notwithstanding they were the innocent offspring of her incontinence, and were, therefore, in the view of the legislature, and consonant to the feelings of nature, justly entitled to be provided for out of such property as she might leave undisposed of at her death, or which would have vested in her, as heir to any of her ancestors, had she lived to take as such. The current of inheritable blood was stopt in its passage from, and through the mother, so as to prevent the descent of the mother's property and of the property of her ancestors, either to her own illegitimate children, or to their legitimate offspring. The object of the legislature would seem to have been, to remove this impediment to the transmission of inheritable blood from the bastard in the descending line, and to give him a capacity to inherit in the ascending line, and through his mother. But although her bastard children are, in these respects, quasi legitimate, they are, nevertheless, in all others bastards, and as such, they have, and can have neither father, brothers, or sisters. They cannot, therefore, inherit from Richard Stephenson, because, in contemplation of law, he is not their brother; and even if he were their brother, they would not inherit their estate under this section, on the part of their mother, but directly from Richard, the descent from brother to brother being immediate. Upon no principle, therefore, can this section help the appellant's case. His estate never vested in the mother, so as for her bastard children to inherit from her; nor did it pass through her in the course of descent to the bastard children.
 
 
 53
 Decree affirmed, with costs.kk 
 
 
 
 j
 Rees' Cyclopedia, art. Bastard. Cooper's Just. Inst. 37 1 Bac. Abr. 510.
 
 
 jj
 3 Henn. & Munf. 225.
 
 
 kk
 The history of the respective disabilities and rights of illegitimate children in different ages and nations, is a subject of curious speculation. The most ancient people of whose laws and political institutions we have any accurate knowledge are the Jews. They appear to make little or no distinction between their legitimate and illegitimate offspring. So, also, the Greeks, in the heroic ages, seem to have regarded them as in every respect equal: but at a subsequent epoch they were stigmatized with various marks of unfavourable distinction. Among the Athenians, the offspring of parents who had contracted marriages, which though valid by the law of nations, were contrary to the policy and the positive institutions of the state, were considered as illegitimate; and all bastards were not only deemed incapable of inheriting from either of their parents, but excluded from public honours and offices, and negarded as aliens to the commonwealth. Thus, the citizen who married a foreign woman at once degraded and denationalized his offspring.a The seversity of this law was however occasionally mitigated from motives of policy; and when the ranks of the citizens of a Grecian republic became thinned by wars and proscriptions, they were filled up again from this disfranchised class. (Arist. Politic. l. 3. c. 3. Id. l. 6. c. 4.)
 
 
 
 54
 The Roman law distinguished between the offspring of that concubinage which it
 
 
 55
 tolerated as an inferior species of marriage, and 'the spurious brood of adultery, prostitution, and incest.' (Gibbon's Decl. & Fall, &c. c. 44. s. 1.) The former were termed naturales; and the latter, spurii, adulterini, incestuosi, nefarii, or sacrilegi, according as they were respectively the fruit of prostitution, of incest between persons in the direct line of consanguinity, or related in remoter degrees, and of the violation of vows of chastity.
 
 
 56
 None of these different classes of illegitimate offspring were stigmatized by civil degradation, or excluded from aspiring to public honours.
 
 
 
 a
 Leges Attica, Sam. Petiti, tit. 4 de liberis legit. nothis, &c.
 (OEuvres de D'Aguesseau, tom. 7. pp. 384, 385. Dissert, sur les Bastards.) But 'according to the proud maxims of the republic, a legal marriage could only be contracted by free citizens; an honourable, at least an ingenuous birth, was required for the spouse of a senator: but the blood of kings could never mingle in legitimate nuptials with the blood of a Roman; and the name of Stranger degraded Cleopatra and Berenice to live the concubines of Mark Anthony and Titus.' (Gibbon, ubi supra.) 'A concubine, in the strict sense of the civilians, was a woman of servile or plebeian extraction, the sole and faithful companion of a Roman citizen, who continued in a state of celibacy. Her modest station, below the honours of a wife, above the infamy of a prostitute, was acknowledged and approved by the laws.' (Ib.) Thus there were several classes of persons who could not lawfully be concubines, either in respect to the infamy of their characters, ut meretrices; or in respect to their rank in life, ut ingenuoe et illustres; or in respect to their condition as married women, or nuns professed, or as within the prohibited degrees of consanguinity. (OEuvres de D'Aguesseau, ubi supra.)
 Although bastards were not deprived of any civil rights by the Roman law, and 'the outcasts of every family were adopted without reproach as the children of the state,' yet they were excluded in the early ages of the republic from all claim to the property of their deceased parents. As the law of the XII Tables only called to the succession the agnates, or the persons connected by a line of males of the same gens or family; and absolutely disinherited the cognates or relations on the side of the mother, bastards could have no claim to the property of their parents by inheritance: not to that of the father quis neque gentem, neque familiam habent; nor to that of the mother, because her relations were entirely excluded. It seems, however, that there was no law prohibiting the father from making a provision for his illegitimate children by will, until the time of Constantine, who made some regulations restraining this liberty; which, however, are involved in such obscurity, that the commentators
 are not agreed as to their precise nature. J. Godefroy, in his commentary on the Theodosian code, is of the opinion that these regulations annulled such provision by will in favour of bastards wherever the testator left any legitimate children, or father, mother, brothers, or sisters. (Jac. Godefroy. Com. ad. Cod. Theodo. l. 1. De natural, fillis.) Be this as it may, it is certain that the Emperor Valentinian, A. D. 371, permitted the bastard children of fathers, who had also legitimate offspring, to acquire either by donation or will, one-twelfth part of the paternal property; and in case the father had no legitimate children, or surviving parents, he might dispose in the same manner of one-fourth of his estate in favour of his illegitimate children. (Cod. Theodos. l. 1. De natural. liberis.) Justinian again permitted those who had both legitimate and illegitimate children to give or bequeath one-twelfth part of their property to the latter; and in case they had no legitimate children, to make the same disposition of a moiety of their estate. (Novell. 18. c. 5. Pothier Pandect. in Nov. Ordin. Redact. tom. 2. p. 55.) He afterwards permitted them, in case they had no legitimate children, nor father or mother, 'quibus necessitas est legis relinquere partem propriae substantiae competentem,' to leave the whole of their property to their illegitimate offspring; and in case their father or mother survived, the whole, except what the parents were entitled to by law. (Novell. 89. c. 12.) Justinian also established, for the first time in the Roman jurisprudence, the principle of giving to illegitimate children a legal claim to a portion of their fathers's property by inherintance ab intestato, by providing, that in case the father died intestate, leaving neither wife nor legitimate offspring, his natural children and their mother should be entitled to one-sixth part of his estate. (OEuvres de D'Aguesseau, tom. 7. 389.) This, however, must be understood strictly of the children born in concubinage, such as the Roman law recognized this domestic relation; and not of 'the spurious brood of adultery, prostitution, and incest, to whom, (according to Gibbon,) Justinian reluctantly granted the necessary aliments of life;' but from whom it would, in fact, appear that he inhumanly withheld ever this provision.
 'Omnis qui ex complexibus nefariis aut incestis, aut damuatis processerit, iste neque naturalis nominatur, neque alendus est a parentibus, neque habehit quoddam ad praesentem legem participium.' (Novell. 89. c. 12. s. 6.) It seems, therefore, that this provision for the necessary support of illegitimate children was confined to those termed naturales. (Ib.)
 The stern contempt of the early Roman legislators for the female sex had entirely excluded the cognates from the rights of inheritance, 'as strangers and aliens.' This necessarily prevented even legitimate children from succeeding to their mother; and it is not, therefore, surprising that bastards could claim no part of the maternal estate. When the rigour of this principle was relaxed by the equitable interference of the praetor, his edict called indiscriminately to the succession both the legitimate and illegitimate children of the mother. (OEuvres de D'Aguesseau, tom. 7. p. 391. Pothier. Pandect. in Nov. Ordin. Redact. tom. 2. p. 557.) This rule was subsequently confirmed by the Tertullian and Orphitian senatus consulta, and continued the law of the empire ever afterwards, except that Justinian engrafted into it an exception unfavourable to the illegitimate children of noble women, mulieres illustrae. (Ib.)
 The Roman law had provided various modes by which bastards might be legitimated. 1. The first was by a subsequent marriage of the father and mother; a mode of legitimation first established by Constantine. 2. Per oblationem curioe, a mode introduced by Theodosius and Valentinian, which was when the parent consecrated his child to the service of a city. But this only had the effect of legitimating the children in regard to their father. They had no right to inherit from conllaterals, and even their claim to inherit from their father was confined to his property within the city to whose service they were devoted. 3. Adoption blone was declared by the emperor Anastasius to be sufficient to legitimate the natural children of the person adopting them. But this law was abolished by Justin and Justinian. 4. By the last will of the father, confirmed by the emperor. But this only applied to cases where he had no surviving legitimate children, and had some sufficient reason for not having married the mother of his natural children. 5. Per rescriptum principis; by a special dispensation from the
 emperor granted upon the petition of the father, who had no legitimate offspring, and whose concubine was dead, or where he had sufficient reasons for not marrying her. 6. By the recognition of the father; as if the father designated one of his natural children as his child in any public or private instrument; this had the effect of legitimating the child thus acknowledged, and all his brothers and sisters by the same mother, upon a legal presumption, that a marriage might have been contracted between the parents. In all these cases, except the 2d, the children thus legitimated were in all respects placed upon the same footing as if born in lawful wedlock. (OEuvres de D'Aguesseau, tom. 7. p. 393, and seq. Pothier, Pandect. in Nov. Ord. Redact. tom. 1. p. 27.)
 It should be added, that none of these modes of legitimation could apply to the offspring of criminal commerce, ex damnato coitu; since they all suppose that the children are born of a concubine with whom the father might lawfully intermarry. (Aeuvres de D'Aguesseau, ubi supra.)
 By the Roman law if a bastard left legitimate children, they became his heirs precisely as if he himself had been legitimate. But if he died, without having been himself legitimated, and without children, his succession was determined by the rule of reciprocity, and his father and mother, &c. succeeded to him, precisely as he would have succeeded to them. If he had been legitimated while living, his succession was regulated in the same manner with that of persons born in lawful wedlock. (Id. p. 399.)
 By the Canon law, the subject of bastardy was, in general, regulated in the same manner as by the Civil law. But though bastards were capable by the latter of aspiring to all the honours and offices of the State, the former refused them the same privileges in respect to the dignities of the church. The canonists also aimed to exclude them entirely from the succession of their father or mother, but allowed all indiscriminately a right to claim the necessary aliments of life. After legitimation in any of the modes provided by the civil law, such as a subsequent marriage of the parents, & c. they regarded them in the same manner as if born in lawful wedlock. (Id. p. 400.
 et seq.) It was this rule which they endeavoured to impose upon the English barons at the parliament of Merton in the reign of Henry III. (1 Bl. Com. 456.)
 The laws of those European countries which have adopted the Roman law as the basis of their municipal jurisprudence, regulate the rights and disabilities of illegitimate children in the same manner as they are determined by the civil and common law. But the Gothic monarchies of Europe adopted from the earliest times a legislation on this subject, in many respects different from that of imperial and papal Rome. Thus, in all the provinces of France, where the droit coutoumier, or unwritten law, prevailed, bastards were incapable of inheriting ab intestato, except the property of their legitimate children, and the reciprocal right of the husband and wife to succeed to each other according to the title of the civil law, unde vir et uxor. This was the universal law of the kingdom, with the exception of the peculiar customs of a few provinces, and the pays du droit ecrit, where the Roman law constituted the municipal code. (Ferriere. Dict. Mot. Bastard. OEuvres de D'Aguesseau, tom. 7. pp. 403. 430. 448.)
 They were, also, with the exception of certain local customs, incapable of taking by devise from their parents, except des donations moderes pour leur alimens et entretiens. (Ferriere. Dict. ubi supra. OEuvres de D'Aguesseau, tom. 7 p. 431.)
 The king was the heir of all bastards dying without legitimate children, or without having disposed of their property by donation inter vivos, or last will and testament, in the same manner as he inherited the estates of aubains, or aliens, dying in the kingdom. (Ib.) Of the various modes of legitimation known to the civil law, that of France adopted only two, 1. that by a subsequent marriage of the parents, and 2. by authority of the prince. (OEuvr. de D'Aguesseau, tom. 7. p. 437. The bastard who was legitimated by the subsequent marriage of his parents, was placed upon the same footing as if born in lawful wedlock, as to personal rights, and those of property; but he who was legitimated by authority of the prince, par lettre du prince, although capable of aspiring to civil honours and offices, was incapable of inheriting, or transmitting property
 by inheritance. (Id. p. 462.) Such was the law of France before the revolution; but it was greatly modified by the compilers of the new civil code, who retained but one mode of legitimation, that by a subsequent marriage and recognition of the parents. (Code-Napol eon, art. 331, 332, 333.) Illegitimate children, legally recognized as such, are entitled, in case their father shall have left legitimate descendants, to one third of the portion to which they would have been entitled had they been legitimate; in case the former shall have left no descendants, but only kindred in the ascending line, or brothers or sisters, to a moiety of the same; and in case the parents shall have left neither descendants, nor kindred in the ascending line, nor brothers or sisters, to three fourths of the same portion. (Ib. art. 757.) They have a right to the whole of their parents' property where the latter shall have left no kindred within the degrees of succession. (Ib. art. 758.) Their descendants are entitled to the same rights, jure representationis. (Ib. art. 759.) But bastards are not entitled in any case to succeed to the relations of their parents; (Ib. art. 756.) and none of these provisions are appliable to bastards, the fruit of incestuous or adulterous intercourse, who are only entitled to necessary aliments. (Ib. art. 762, 763, 764.) The property of bastards leaving no posterity, is inherited by the parents who shall have recognized them. (Ib. art. 765.) And in case the parents are deceased, the property received from them, is inherited by the legitimate brothers and sisters of the bastard; and all his other property by his illegitimate brothers and sisters, or their descendants. (Ib. art. 766.)
 By the law of Scotland, the king succeeds as ultimus hoeres, to the estates of bastards, and they cannot dispose of their property by will, unless to their lawful issue, without letters of legitimation. But these letters do not enable the bastard to succeed to his natural father, to the exclusion of lawful heirs; for the king cannot, by any prerogative, cut off the private right of third parties. But he may, by a special clause in the letters of legitimation, renounce his right to the bastard's succession, in favour of him who would have been the bastard's heir had he been born in lawful marriage, as such renunciation does
 not encroach upon the rights of third parties. (Erskine's Inst. B. 3. tit. 10. s. 3.) A bastard is not only excluded, 1. From his father's succession, because the law knows no father who is not marked out by lawful marriage; and, 2. From all heritable succession, whether by the father or mother; because he cannot be pronounced lawful heir by the inquest, in terms of the brief; but, also, 3. From the moveable succession of his mother; for, though the mother be known, the bastard is not her lawful child, and legitimacy is implied in all succession deferred by law. But though he cannot succeed jure sanguinis, he may succeed by destination, where he is specially called to the succession by an entail or testament. (Ib. s. 4.)
 The laws of England respecting illegitimate children, are too well known to render any particular account of them necessary in this place. Vide 1 Bl. Comm. 454. et seq. Co. Litt. by Hargr. & Butler, 3 b. note 1. Id. 123. a. note 8. Id. 123. b. note 1, 2. Id. 243. b. note 2. Id. 244. a. note 1, 2.Id. 244. b. note 1.
 
 
 k
 2 Bl. Comm. 247.
 
 
 l
 Cooper's Just. Inst. 561.
 
 
 m
 Cooper's Just. Inst. 561. note.
 
 
 n
 1 Bl. Comm. 459.
 
 
 o
 Wilcocks v. Rootes, 1 Wash. Rep. 140.
 
 
 p
 3 Henn. & Munf. 225.
 
 
 q
 Id. 229. note.
 
 
 r
 3 Call's Rep. 105.
 
 
 s
 1 Wash. Rep. 139.
 
 
 t
 3 Call. Rep. 269.
 
 
 u
 2 Henn. & Munf. 187.
 
 
 v
 3 Henn. & Mumf. 231.
 
 
 w
 Which provides, that 'in making title by descent, it shall be no bar to a party that any ancestor through whom he derives his descent from the intestate is, or hath been an alien. Bastards also shall be capable of inheriting or of transmitting inheritance on the part of their mother, in like manner as if they had been lawfully begotten of such mother.'
 
 
 x
 7 Cranch, 476.
 
 
 y
 7 Cranch, 476.
 
 
 z
 Hargr. note. Co. Litt. fol. 244. b. 245. a.
 
 
 aa
 1 Woodes. 391.
 
 
 bb
 2 Vern. 642.
 
 
 cc
 7 Cranch, 456.
 
 
 dd
 Domat, Loix Civiles, l. 1. s. 2. art. 10.
 
 
 ee
 Ld. Raym. 68.
 
 
 ff
 The King v. The Inhabitants of Hodnett, 1 T. R. 96.
 
 
 gg
 1 Bl. Comm. 486.
 
 
 hh
 1 Woodes. 394.
 
 
 ii
 Nov. 89. c. 12. s. 4.