Parker, J.
This is a case arising under the law of descents enacted in 1785, and it presents the question whether, by virtue of the section which is the 18th of ch. 96. in the revised code of 1819, a mother can inherit from her illegitimate child, and bastard brothers and sisters can inherit from each other; or whether, under the Í4th section of the same act, the heir of the illegitimate child’s wife, or the wife herself if living, takes the estate in preference.
By that section the claims of the wife, or if she be dead, of her kindred, are postponed to the claims of the kindred of the husband ; so that if Preston Garland, the illegitimate son of the appellee Frances Harrison, had a mother, brothers or sisters, or any kindred, capable by law of taking his estate, the pretensions of the appellant are unfounded, and the decision of the circuit court, as to him, was correct.
To exclude the wife and her kindred, however, it is not enough that the intestate should have left a mother and brothers, incapable themselves of inheriting. The 14th section evidently postpones the claims of the husband or wife, only to paternal and maternal kindred capable of inheriting ; and if it could be shewn to my satisfaction that the mother and brothers of the bastard in this instance did not come within the provisions of the 18th section, I should have little doubt of the right of the appellant under the 14th, rather than that the inheritance should escheat. The commonwealth, by the terms and policy of the act, is wisely postponed to every other claimant, and in all doubtful cases I should incline against the doctrine of escheat, without reference to any other system of jurisprudence.
I shall therefore consider only the effect of the 18th section, taking it for granted that if the mother or bro- *371 there of the bastard are not entitled under that section, the kindred of bis deceased wife have a preferable claim to the commonwealth, by virtue of the 14th.
Before adverting to the words of the 18th section, it may be proper to make a few preliminary remarks, to enable us the better to understand its force and effect. On more than one occasion in this court, the aid of the common law has been invoked, for the purpose of supplying the supposed defects in our act of descents, and guiding us in cases of doubtful construction. But the attempt has never succeeded. Oil the contrary, it has been considered that the act of 1785 entirely repealed and abrogated the common law course of descents, and all the principles thereof; that its enactments stand in direct and diametrical opposition to all the rules and canons of the common law; and that it is a complete and perfect whole, containing within itself a provision for every case that can arise. Davis v. Rowe, 6 Rand. 355.
Its basis was the statute of distributions and the civil law. It is founded on the great principles of justice. Its object was to make such a will for the intestate as he would himself probably make; and its obvious policy was to follow the lead of the natural affections, and to consider as most worthy, the claims of those who stand nearest to the affections of the last occupant. It ought, therefore, to be at all times liberally construed in favour of those to whom the intestate himself, had he made a will, might be supposed to be most favourable, without reference to common law rules or feudal disabilities : and this is our safest guide in its construction, and entitled to more consideration than any other. Opinions of judges Tucker and Roane, in Stones v. Keeling, 5 Call 144, 147, 148.
It is obvious that the circumstance of a child’s being an alien or a bastard does not prevent the affection of the parent from flowing towards it: nor does the mo *372 ther’s frailty extinguish in the breast of her illegitimate offspring the sacred feelings of filial piety. Yet in the case of aliens these natural affections and feelings could not be fully indulged, consistently with the well settled policy of almost every state, which interdicts foreigners from holding lands; and therefore the law has, in language admitting of no doubt, continued their disabilities, although allowing inheritances to be transmitted through them.
In respect to bastards, however, no well settled and uniform rule of policy excluded them, from inheriting or transmitting inheritance. At the date of the act, the rigour of the common law was gradually yielding to more enlightened views, and there was nothing which forbade the legislature, in this case, from giving indulgence to the natural feelings and affections. The civil law, to a certain extent, had set the example, of treating illégitimate children, and their erring mothers, with greater justice than the common law tolerated; whilst in our sister states, more humane and liberal views were opening to the contemplation of the legislator. It could not have escaped the sagacious and well trained mind of the draughtsman of this act, that there was really no serious obstacle to the introduction into our code of the very reasonable principle, that “ the relations of mother and child, existing in this unhappy case, ought to produce the ordinary legal consequences of that consanguinity,” in the transmission of property, as well as in other respects. Even by the common law, the rule that a bastard is nullius filius applied only to cases of inheritance; and he was subject to no other disability but the incapacity of inheriting and transmitting inheritance. It was the object of the act to effect a change in his legal condition; to abolish this distinction, to a certain extent, between legitimate and illegitimate children; and to endow the latter with heritable blood on the part of the mother. There is no reason *373 for thinking that the legislature meant to retain any of the incapacities, ex parte materna, under which the bastard laboured; one of which was, that in default of issue he could not transmit his estate to his kindred (the objects perhaps of his tenderest affections and solicitude) but that it should rather escheat to the commonwealth. That he could not take by descent, was only one of the hardships imposed upon him by the common law. Another was, that if he died under age or without a will, his estate, if he had no children, escheated to the crown ; whilst those who were lawfully begotten transmitted theirs to their mothers, brothers, sisters, and all their collateral and ascending kindred. It was the object of the law to give him a mother, and to place him in all respects upon the same footing as a lawfully begotten child, born of the same mother. In no other manner could the innocent offspring be purged of the sins of the mother, and restored to the legal capacities which spring from the relations of parent and child. Allowing that the claims of the guilty or unfortunate mother were wholly disregarded, and those of the innocent offspring the only subject of legislative consideration, it would seem to require that the mother should inherit from the child, as well as the child from the mother : and as to the inheritance of collateral kindred from the bastard, no principle of policy that I can discover, no fear of encouraging illicit intercourse, no desire to discountenance the guilty, could affect their case.
That the legislature entertained these just and liberal views towards illegitimate children, in no respect answerable for their parents’ vices, is further shewn by the provisions of the 19th section, which, in case of subsequent marriage and recognition by the father, legitimates them throughout, and restores entirely their heritable blood. That the same language was not used in the 18th section, was probably owing to the difficulty *374 of ascertaining the real father with reasonable certainty, by evidence unexceptionable in its character; but I have no doubt that it was intended, by the 18th section, to bestow upon illegitimate children the same capacities of inheriting from or through their mother, and passing inheritances to and through her, as they possess under the 19th section, in respect to both parents; that is to say, to make them in all respects the legitimate children of their mother.
Now let us attend to the words of the 18th section. “In making title by descent, it shall be no bar to a party, that any ancestor, through whom he derives his descent from the intestate, is or hath been an alien. Bastards also shall be capable of inheriting or of transmitting inheritance on the part of their mother, in like manner as if they had been lawfully begotten of such mother.”
The first part of this section, respecting aliens, removes the bar of alienage in making title by descent through collateral as well as lineal kindred. Jackson v. Saunders, 2 Leigh 109. It does not provide for descents from aliens; and therefore it has been argued that the next clause, connected as it is by the word “ also,” did not mean to authorize descents from bastards. But neither does the first clause give to aliens the capacity of inheriting, as the second manifestly does to bastards. The two clauses are no otherwise connected, than through the common design of removing disabilities arising out of the civil condition of each at the common law. The adverb “ also” is introduced simply to mark the transition, and could not have been intended to authorize the inference that similar provisions were in contemplation for the two cases, or that, because inheritances were to pass only through aliens, they were also to pass only through bastards, and not from as well as to them. The provisions of the act are in fact, under any construction, entirely dissimilar, excluding aliens *375 from inheriting, but giving the capacity to bastards. It is said, however, that the legislature only meant to remove obstructions in favour of meritorious objects, such as citizens claiming a descent through aliens, and irmocent illegitimate children claiming from or through their guilty mother; but that such mothers, like aliens, not being meritorious in the eye of the legislature, were intended, like them, to be precluded from inheriting. There is nothing in the act itself manifesting such a design; and it seems to me to be excluding from view the provisions actually made in favour of the bastard, for the sake of a theory, and because they may redound to the benefit of others, one of whom, and only one, can be charged with guilt. If the mother is excluded under this construction, so are the brothers and sisters and other collateral kindred of the bastard, who are as innocent in the eye of the law as he is; and to exclude them from inheriting from each other, because the mother is not meritorious, would seem, even according to this argument, to be incompatible with the design of the legislature. I am persuaded that the merit or demerit of the Lwo classes of persons named in the 18th section had little or no influence upon the provisions respecting them. The intention was to make such a will for the intestate, as, if he had died testate, he would have been most likely to make for himself; and doubtless aliens, as well as bastards, would have been given heritable blood, if no principle of national policy had been opposed to it. This was the most just and reasonable rule the legislature could have adopted in regulating descents, as well as the most accordant with the right to and dominion over property, and seems to have been adhered to in every case not governed by other overruling considerations.
It is asked, then why postpone the wife, the tenderest and most cherished object of the husband’s aflection, in favour of his erring mother, or bastard brother or sister? *376 I answer, for the same reason that she is postponed in all other cases; that is to say, because she is otherwise provided for. The true contrast is not between the claims of the endowed and portioned wife, and the guilty or unfortunate mother and her innocent offspring, but between their claims and that of the commonwealth, if the bastard was never married; for the argument assumes that his inheritance shall rather escheat than go to them.
To return to the words of the act. By the words “bastards also shall be capable of inheriting on the part of their mother,” their incapacity to take from the mother, or through her, is removed. If the law had stopped here, it might be contended that they could not transmit inheritance to any one except to their descendants at common law; and if the object had been only to give a capacity to take real property by descent immediately from or through their mother in the ascending line, and to transmit the same to their descendants, it seems to me it would have stopped here. But they are also made “ capable of transmitting inheritance on the part of their mother;” and how? “ in like manner as if they had been lawfully begotten of such mother.” This legitimates the bastard in respect to the mother, makes his blood heritable on her part, and restores him to his maternal kindred in matters of inheritance.
The counsel for the appellant contend that the inheritance to be transmitted must have come from or through the mother, and that such is the meaning of the words “ inheritance on the part of the mother.” Thus they would confine the law to the rare case of an inheritance descending on the part of the mother, which the bastard is allowed to transmit, either (I suppose) to descendants or collaterals, whilst they exclude the more common instance of acquisitions made by the bastard, or coming to him otherwise than by descent from or through the mother. According to this argument, such *377 acquisitions can never go to any persons other than lineal descendants, or (under the 14th section) the wife, and kindred of the wife; and if he has no wife or lineal descendants, the inheritance must rather escheat, than pass to his mother and collateral kindred. It appears to me that this construction is not required by the terms of the act, nor justified by its spirit. The expressions “ transmitting inheritance” &c. may well refer to the heirs to whom the inheritance is to be transmitted, and to the line in which it is to pass. The intention, 1 admit, was not. to legitimate bastards generally, for in that case the legislature would have used language similar to that contained in the 19th section : but the object was to make them quasi legitimate on the maternal side ; to give the bastard a mother and maternal kindred, and to make them heritable from each other in the order prescribed by the law of descents, as if the bastard had been lawfully begotten of such mother. It places this line, in respect to inheritance, precisely in the situation it would be in, if one born in lawful wedlock should die leaving no paternal kindred. It speaks of transmitting inheritance, in the most general sense; not merely inheritance or inheritances acquired on the part of the mother: and it is the same thing as if the legislature had said, “ bastards also shall be capable of inheriting or of transmitting, on the part of their mother, inheritance, in like manner as if they had been lawfully begotten of such mother.”
Much criticism has been expended on the word transmit, which I shall no, further notice than to observe, that in its first and original sense, it means to send from one person or place to another, and is therefore appropriate to express the legislative will, as I think it ought to be interpreted. It would be equally appropriate, I admit, if the context justified it, to indicate the estate to be transmitted.
*378 We have no decisions in our state (of the court of appeals) bearing on this question : but I am much mistaken if the construction I give to the act is not the generally received one amongst Virginia lawyers. It seems, too, to have been unhesitatingly expressed by chancellor Kent, whose opinions are entitled to great respect. In the second, volume of his commentaries, part 4. ^ 29. p. 212. 2d edition, he mentions the states in which “ bastards can inherit from and transmit to their mothers, real and personal estate;” and among them Virginia, and Kentucky, the law of which state is an exact copy of our own. In his 4th volume, part G. § 65. p. 414. he repeats the assertion. In New York, the estate of an illegitimate child may descend to his mother, whilst, by a singular anomaly, such child cannot succeed to the estate of the mother. By the roman law, too, as declared by Justinian, the mother succeeded to the estate of her illegitimate children, and those children could take by descent from her. In Holland, bastards inherit frQtn the mother', and they can transmit to their own children, and in default of them, f.o the next of kin on the mother’s side : which seems to be the law of North Carolina, where the mother does not take, but their brothers and sisters by the same mother may. In Louisiana, the rights of natural children are more favoured than in any other part of the United States for in certain cases they inherit from the father as well as the mother, and the father and mother inherit equally to their illegitimate offspring; and in default of parents, the estate goes to the natural brothers and sisters of the bastard, and to their descendants. 4 Kent’s Com. 2d edi. 415, 416.
These relaxations of the severity of the common law rest upon the principle, “ that the relation of parent and child, which exists in this unhappy case in all its native and binding force, ought to produce the ordinary legal consequences of that consanguinityand I am *379 persuaded it was the intention of the legislature of i ° Virginia to adopt the most liberal rule in respect to an inheritance in cases of bastardy, that was consistent with the certain ascertainment of the parents.
The only case which in any degree conflicts with this opinion, is the one cited of Stevenson’s heirs v. Sullinanl, 5 Wheat. 207. And even that seems to have turned somewhat upon the point, that the descent between brother and brother was immediate, and not on the part of their mother. I cannot however bring my mind to assent to the reasoning, or to the conclusions, of the learned .judge who delivered the opinion of the court in that case. He seems to me to have taken too narrow and technical a view of the subject, and to have relied on the disabilities of bastards growing out of the common law, without duly considering the spirit and policy of our act of descents, w'hieh leaves little or nothing for the common law to act upon, but creates a system complete in itself. Be that as it may, the case, although entitled to very great respect from this court, is not binding upon us as an authority, and must not be permitted to control our judgments.
it will be perceived, then, that I approve the decree in favour of the mother, and the rejection of the appellant’s pretensions; but that I dissent from that part of it which gives the estate to the mother alone. The brothers of a bastard, whether they be legitimate or illegitimate, are of the half blood to him, and when they come to the succession with the mother, are entitled to half portions. The bastard brothers in this case were entitled, under the 4th section of the act, to share with their mother; and by the 15th section, only to half as much as she takes.
Brockenbrough, J.
The 18th section of the statute of descents declares that “ in making title by descent, it shall be no bar to a party, that any ancestor, through *380 whom he derives, his descent from the intestate, is or hath been an alien. Bastards also shall be capable of inheriting or transmitting inheritance on the part of their mother, in like manner as if they had been lawfully begotten of such mother.”
Preston H. Garland, the bastard son of Frances Harrison, acquired from his reputed father James Garland a considerable estate, real and personal. He married a daughter of James P. Garland the appellant. His wife died before him, without issue, and the appellant her father is her heir at law. The bastard then died without issue, and intestate. His mother, and two other bastard sons of the mother by a different father, named Madison Harrison and Wiatt Harrison, survived the intestate. The question is, whether that mother and those two illegitimate brothers take the estate under the above section of the act, or whether the father of the wife, as her heir, takes it under the 14th section of the same act. Let us examine each member of the clause separately. “ Bastards shall be capable of inheriting on the part of their mother, in like manner as if they had been lawfully begotten of such' mother.” These last expressions are specially to be noted, in ascertaining the meaning of the clause which gives bastards the capacity of inheriting and transmitting inheritance'on the part of the mother. A bastard is still nullius patris films, but he is not in that position as to his mother. As to her, he is as if he had been born in lawful wedlock; in other words, he is her legitimate son, so far as regards his capacity to inherit and transmit inheritance. Whatever capacity a legitimate son of the mother would have to inherit or transmit inheritance, the same attaches to a bastard, as to inheritances and transmission of inheritances on the part of the mother.
What, then, is the meaning of the phrase on the part of the mother ? “ Bastards shall be capable of inheriting on the part of their mother.” The bastard is not *381 restricted to an inheritance from the mother, or through the mother in the direct line, but he may take an mheritance, on the part of the mother, from the collateral ... . . line. For he may take it in like manner as a legitimate son of the mother. If a woman has two legitimate sons A. and B. by different marriages, although A. cannot inherit from the father of B. yet he may inherit from his own mother, or his maternal grandfather or grandmother, in the direct line, and so on in infinitum; or he may inherit from his maternal uncle or aunt, or from his maternal great uncle or great aunt, in the collateral line, and so on in infinitum: and these are all inheritances on the part of the mother. So he may inherit a half portion from his uterine brother B. (if B. be an adult, or being an infant, the land descended to him from his mother’s side) the said B. having a whole brother who would take a double portion. I state these cases of an inheritance by a legitimate son on the part of his mother, as an illustration of the capacity of a bastard son to inherit on the part of his mother. A bastard may inherit on the part of his mother, in like manner as if be were the Legitimate son of his mother. He may therefore inherit from his mother, or from his maternal grandparents, in the direct line, or from his maternal uncle and aunt, or great uncles and great aunts, in the collateral, and a half portion from his legitimate or bastard half brother, in the same manner that a legitimate son could inherit from his legitimate half brother. A bastard cannot have whole brothers; but every uterine brother, whether legitimate or spurious, is his half brother.
So far as this pari of the clause goes, although a bastard may inherit from his mother, yet it does not follow that Ins mother could inherit from him. But let us consider the effect of the other part of the clause.
“ Bastards shall be capable of transmitting inheritance on the part of their mother, in like manner as if *382 they had been lawfully begotten of such mother. The , . . i. _ verb to transmit rs used m two senses. I he first is, “to send from one person or place to another j” and this appears to be its principal meaning. The second is, “ to suffer to pass through.” The first is the meaning attached to it by dr. Johnson, and the more modern lexicographer mr. Webster; and each of them gives several beautiful illustrations of this meaning. The second meaning is given to it by Webster. Admit them both to be correct; then the person who transmits a thing is the terminus a quo the thing proceeds or is sent, or he may be merely the conduit through which the thing passes. Shall we then confine the terms “transmitting an inheritance,” to the second meaning ? or shall we extend to them both of the significations ? The supreme court of the United States in Stevenson's heirs v. Sullivant, 5 Wheat. 207. appear to have given them the limited construction ; but it seems to me, without good reason. This case, being a construction of our own statute, is not looked upon as authority in this court, whatever respect may be paid to the opinion of the eminent judge who pronounced the decision, or of those who formed the court. On the contrary, that court will consider itself bound by the decisions of this court, in all cases depending on the construction of our own statutes, which do not come in conflict with the constitution or laws of the United States.
As bastards have capacity to transmit inheritance on the part of their mother, in like manner as if they had been lawfully begotten of such mother, we have to en-quire how a lawfully begotten son of the mother, that is, a legitimate son of hers, may transmit inheritance on the part of his mother.
Now, no matter how a legitimate son acquires property, his capacity to transmit that property is fixed by the law. If he acquires it by descent or byr purchase, and being an adult, dies intestate, leaving no children *383 or other lineal descendants, nor father, nor full brother or sister, nor descendants of any of them, but leaving his mother and a half brother on his mother’s side, surliving him, he transmits his whole inheritance to them, by the 4th and 15th sections of the act of descents; that is, by the 4th section, the real estate descends to his mother and brother; but as the brother is only of the half blood, by the 15th section, only a half portion descends on him. Two thirds, therefore, descend on the mother, and one third on the half brother. In such case the inheritance proceeds from, the deceased son, and the descent is a transmission of it to these his heirs.
So with a bastard, under the 18th section of the law. He shall transmit his inheritance on the part of his mother, in like manner as if he had been lawfully begotten of such mother. He dies intestate, and leaves no children. He leaves no father, for he never had one. But he leaves a mother, and a brother the son of that mother, — whether legitimate or illegitimate, makes no difference. Every bastard son is half brother to every other, as to inheritance and transmission of inheritance. The inheritance of the deceased bastard son, in such case, is therefore transmitted (in like manner as if he had been legitimate) to his mother and half brother, in the proportions fixed by the law.
There are sundry objections made to this construction of the statute, some of which I will notice.
First, it is said that the second clause of this 18th section should be construed like the first clause of the same section. That first clause reads thus: “In making title by descent, it shall be no bar to a party, that any ancestor, through whom he derives his descent from the intestate, is or hath been an alien.” In this case the only object of the legislature was to remove the impediment, which the alienage of any ancestor presented, to the passage of the inheritance from the intestate to his heir, whether lineal or collateral. This provision of *384 the statute seems to have been taken from the english statute of 11 and 12 Will. 3, ch. 6. (2 Black. Com. 251.) But nothing like the capacity of bastards to inherit or transmit inheritance is found in the english statutes. The object of the two clauses is essentially 'different. No capacity is conferred on the alien to inherit lands, or to be active in the transmission of inheritance to others. At common law, he was the impediment to the passage of the inheritance by descent. By the statute the bar is removed, whether he be dead or living, and he becomes the passive conduit for the passage of the inheritance from the intestate to the living claimant. But as to the bastard, the provision is much more extensive. On him is conferred the capacity to inherit, on the part of the mother, and to transmit inheritance on the part of the mother, in like manner as a legitimate son of that mother. He is not the mere passive conduit for the passage of the inheritance, but the active agent in transmitting the inheritance. As a legitimate son of the mother might transmit the inheritance, so may the bastard transmit it on the part of the mother. Nor can the active capacity conferred on him to transmit inheritance be restrained by the use of the word also. It is true that it is in general an adverb, and means in like manner; but dr. Johnson tel Is us truly, that it is sometimes nearly the same with the word and, only conjoining the members of the sentence. In the clause under consideration, it seems to me to be a mere word of connection; it conjoins dissimilar provisions, and is superfluous.
Secondly, it is said that it is against the policy of the law, to give the construction contended for: that as the bastard has not committed any offence, it was a correct and humane policy in the law, to abate the rigour of the common law, and to confer on him the capacity of inheriting from his mother, however guilty she may have been; but that if we construe the law as impart *385 ing a capacity to the offending mother to inherit from her spurious offspring, it will be giving a reward to incontinence, and will weaken the attachment of the peopie to the institution of marriage. This is a consideration which would be more properly addressed to a legislative than a judicial tribunal. It is possible that the objection lies still more strongly against any modification whatever of the common law doctrine on the subject of bastards, than it does against this particular modification. I shall not enquire into it.
Our statute of descents is supposed to have been founded on the natural affections of the human heart, and on natural justice. It takes men as it finds them ; and in default of their providing by last will and testament for a division of their estales, it makes such a division amongst those who are near and dear to the intestate, as he would probably make, if he were to make a will according to the dictates of nature. This principle is not departed from in the clause of the statute now under consideration. However degraded an unchaste woman may be in the opinion of mankind and in the view of a pure morality, the unfortunate offspring of illicit intercourse is imbued with very different feelings. Nature has stamped on the hearts of mother and son a natural affection which it is impossible entirely to eradicate. However criminal may have been her conduct, the contumely to which she has been subjected by that course has made some atonement for it, and her own child is the last person in the world who will be unforgiving towards her. He will be blind to her faults, and in his dying moments he will endeavour to raise her from that state of sorrow and despair to which her own vices have subjected her. Such is the foundation of the rule of our law, that bastards shall inherit and transmit inheritance on the part of the mother. The father is to him unknown; he is the son of no father; and this circumstance attaches him the more to his mo *386 ther, his only parent. In spite of her faults, if he has no children, she is the dearest object of affection to his heart, and he will leave to her his estate. If he fails to do this by will, the law steps in, and makes the same provision for her that her son would, if he obeyed the impulse of nature.
But here again we are met by the objection, that a bastard son who had acquired property, and, notwithstanding the baseness of his birth, had raised himself to some consideration in society, and had married, would choose the wife of his bosom as his heir, in preference to the offending mother who had brought shame upon him. But the law does not look upon this subject in that light. The law provides otherwise for the husband and the wife. The former it makes tenant by the curtesy, and gives to him ■ all the chattels of the wife, in some shape or other. To the wife it gives dower, and a third, or a half, of the chattels of the husband. These are deemed adequate provisions, and generally are so. The common law never makes the husband, as such, heir to his wife, nor the wife, as such, heir to the husband. Our statute however provides (by the 14th section) that in the last resort, and to save an escheat, the husband or wife shall be the heir. They are postponed to the issue, the father, mother, brothers and sisters and their descendants, and to the paternal and maternal kindred. In the course of descent, it is unreasonable to compare the pretensions of the wife, and, in case of her death, the pretensions of her father, with those of the mother of the intestate, degraded though she be. Though the actual father of the bastard is of no kin to him in contemplation of law, yet his mother is of his kindred, both by nature and by law.
This is the first time that the construction of this section has ever been brought before this court. Until the decision of the supreme court was given, 1 believe it had generally been thought that the natural mother and *387 illegitimate offspring were reciprocally heirs to each other, in the absence of legitimate offspring. Judge Tucker, in a note of half a line to Blackstone’s Commentarles, 2d voi. p. 249. (note 9.) expresses that opinion. The president of this court, in his commentaries, says, “ Although in England, upon the death of a bastard without issue, the estate will escheat for want of heirs, it will not escheat with us, as long as the bastard has any relation on the part of the mother,” &c.
Chancellor Kent, in his commentaries (vol. 2. p. 212. 2d edi.) has this passage : “ Bastards are incapable in New York of taking under the law of descents, and they are equally incapable in several of the other united states, which follow in this respect the rule of the english law. But in ten of the states” (which are enumerated, including Virginia) “bastards can inherit from and transmit to their mothers, real and personal estate.” He thus gives to our law, as well as that of the other states, the construction which I contend for. The law' of New York reverses the rule which the appellant’s counsel here contend for. Although bastards are there incapable of taking under the law of descents, yet chancellor Kent tells us that “ in New York the estate of an illegitimate intestate descends to the mother, and the relatives on the part of the mother.” See also 4 Kent’s Com. pp. 413, 414. These opinions are not referred to as authority, but as persuasive evidence of the correctness of our construction.
I conclude, therefore, that in this case the judge of the circuit court was right in deciding that the mother might inherit to her bastard son: but I think he was-wrong in excluding the two bastard sons of the mother, Madison Harrison and Hiatt Harrison, from the inheritance. They are, as to the intestate, half brothers on the part of the mother, and entitled to half portions. The judge was right in excluding the appellant from all share of the inheritance.
*388 I think that the decree should be reversed, with costs to the appellees, as the parties prevailing, and the cau§e remanded to the circuit court, with directions that a decree be rendered dividing the estate, real and personal, of 'Preston H. Garland into four equal parts, of which two parts shall be assigned to Frances Harrison the mother of the intestate, and one part to each of the sons, Madison and Wiatt Harrison; and for further proceedings.
Tucker, P.
This case turns upon the construction of the 18th section of the law of descents, which declares that “ bastards shall be capable of inheriting or of transmitting inheritance on the part of their mother, in like manner as if they had been lawfully begotten of such mother.” The bill is filed by the mother and bastard brothers of a bastard, claiming his estate against the next of kin of the bastard’s deceased wife. The court decreed for the mother, and from that decree an appeal was taken ; the appellant contending that upon the true construction of the 18th section, neither the mother nor her bastard sons were heirs at law to the deceased, and that the only effect of the act was to give to natural children the faculty of inheriting immediately from their mother, and of transmitting such inheritance to their posterity. In this opinion I cannot concur.
By the common law, bastards were placed under most unjust disabilities. The unoffending offspring of illicit intercourse, instead of being protected by the vigilant care of the law, and invested with a legal right to enforce his strong moral claims upon those whose vicious act had brought him disgraced into the world; — ■ instead of having a title to a full portion, if not to a double portion, of the estates both of his father and his mother, was disabled even to inherit from his mother, whose estate escheated to the crown, in preference to a transmission to her unprotected child. If the preven *389 lion of promiscuous intercourse was the object of the law, it may certainly admit of question whether that object would not have been most effectually promoted by making the bastard a favoured heir of both parents, and denying either to father or mother the power of dishorison. If the provision would not have arrested the offence in the heyday of the passions, it would at least have cut off a large portion of those more vicious cases of deliberate seduction and habitual concubinage, the last of which, after all, is the great enemy of the institution of marriage. How numerous are the instances, amid a dense population, of mature and even hoary bachelors preferring a mistress to a wife, to avoid the burdens and charges and troubles of providing for legitimate children! From such you take away the motive to crime, by imposing the imperative duty of devolving their estates upon their bastards. Be this, however, as it may. It is avowed that the common law disability of bastards is a rule of policy, and as such it has always been rigorously enforced against bastards begotten out of wedlock; while, by a strange inconsistency, bastards begotten in wedlock are not only capable of inheriting from their mothers, but they are also inheritors from those who are not their fathers.
After the termination of the revolution, when a revision and radical change of much of our system of jurisprudence became indispensable, other counsels prevailed as to the law respecting bastards, as well as in relation to inheritances generally. Our law of descents was formed in no small degree upon the human affections ; the legislature very justly conceiving that the object of a law of descents was to supply the want of a will, and that it should therefore conform in every case, as nearly as might be, to the probable current of those affections which would have given direction to the provisions of such will. Under the influence of these opinions, they legislated in relation to bastards. The se *390 veral enactments respecting them clearly indicate their sense of the injustice of the common law, and their determination, as far as possible, to extend to bastards the privileges of legitimacy. Thus, marriage and recognition restored the child to legitimacy, and even bigamy and incest created no indelible stain; for the children of marriages deemed null in law were declared to be legitimate. But there was another and more numerous class to be provided for. They were bastards who were begotten out of wedlock, and whose fathers the law would not undertake to ascertain, except so far as was necessary to indemnify the public against the burden of supporting their offspring. To declare these legitimate, would have been at once to provide them not a mother only, but a father. To such a length the lawmakers were not prepared to go. They were therefore compelled to adopt another phraseology, — to use language which, in relation to the mother and her kindred, would put bastards on the footing of legitimates, while it would leave them, as heretofore, in relation to the father, the sons of nobody. But this was the only difference they could have designed. Was the policy of the marriage institution more fatally invaded by concubinage than by bigamy ? Was illicit intercourse out of wedlock more to be deprecated than incest in wedlock? If not, why should the offspring of bigamy or incest be invested with every privilege of legitimacy ? Why should they inhprit and transmit inheritance, without qualification, or limit ? Why should the false wife, or the incestuous parent, not only transmit Her property to the fruit of her vice and impurity, but also take property by inheritance from her child ? Why should these things be, and the less criminal mother of the child of concubinage be denied the capacity to take from one who, if he be the offspring of her guilt, has been also the object of her care and maternal tenderness, and over whom she has shed the bitter tears wrung from her by her outcast con *391 dition, if she has even failed to wash away her guilt by tears of penitence ? I can see no ground for so harsh and unjust a distinction. 1 can see, indeed, much reason for restoring the filial tie between the mother and her spurious child. I am inclined to suppose that the able men who composed the committee of revisors might well have doubted whether the ineffectual barriers to concubinage, afforded by the disabilities of bastards, were not kept up at the expense of some of the most virtuous feelings of the human heart. They might well have believed it wise to break down these barriers, rather than to continue a system which cherished in the child the spirit of ingratitude to his own mother; which held her up as his greatest enemy, — as one bound by no tie to him, — as one, indeed, by whom he was cut off from the ties of blood with every other human being. I imagine it was under the influence, in part, of such considerations, and with other more profound views of the true policy of the law upon this delicate subject, that the legislature enacted the clause in question; and I have therefore no doubt, that unless restrained by the language of the act, we should give it that interpretation which would place the fruit of concubinage on as favourable a footing, on the part of the mother at least, as the offspring of bigamy or incest is placed, in reference both to father and mother. With these preliminary remarks, let us proceed to the construction of the act. Its language is—
“ Bastards also shall be capable of inheriting or transmitting inheritance on the part of their mother, in like manner as if they had been lawfully begotten of such mother.” Here there arc two clauses, which must be separately examined. The first declares, as I read the statute, that “bastards shall be capable of inheriting on the part of their mother, in like manner as if they had been lawfully begotten of such mother.” It will be observed that I consider the words “ on the part of the *392 mother,” as connected with the first clause; but I do not connect with them the word “inheritance” also. That word is the inseparable adjunct of the word “ transmit,” in the second clause, and exclusively belongs to it. The revisors never could have written that the bastard should have the capacity of inheriting inheritance on the part of the mother. Had the estate, and not the kindred, been in their view, they would have expressly said that he should only inherit such estate as he might derive from or through the mother. But this they have not done. Engaged in restoring heritable blood to the bastard, they were looking to the kindred from whom he was to take, and designed, by the expressions used, to point out that he should be capable of inheriting from all his kindred on the part of the mother, whoever they might be. They could not have designed to give the bastard capacity to inherit from mother, uncles, cousins, and the whole of his kindred, lineal and collateral, except his own brothers. Is there an assignable reason why he should have been excluded from inheriting from them, while he is permitted to inherit from his other maternal kindred ? I can find none. It is said, indeed, that the estate derived by a legitimate from his father might thus pass to a bastard brother. But the hardship.would be not less, if it passed, as by law it may, to a legitimate brother of another father. And the case would be surely no better, if the estate of the legitimate should pass, as it is admitted it may do, to a bastard uncle, or cousin, or any other bastard collateral relation among his kindred. The revisors then did not mean, by the phrase “ on the part of the mother,” to exclude the bastard from a right to inherit from his brothers. They meant, on the other hand, to include them, as kindred on the part of the mother. According to this construction, the statute is intelligible and clear. It provides for every case which can occur, instead of leaving unprovided for, that most common *393 occurrence of inheritance between brothers. It secures the estate of the whole of the bastard’s kindred from escheat for want of heirs, by making him inheritable to them all. "Whereas, according to the other construetion, if a man clics without other connection than a bastard brother, his estate must escheat for want of heirs, though if he has a basiard cousin, it will not do so. Such spotting with the interpretation of statutes, I am indisposed to join in; and the rather, as the construction contended for has no plausible support without an interpolation into the language of the statute. Read the clause to any man whose mind is not distorted by the technical notion that the descent from brother 1,o brother is immediate, and he will readily understand that the capacity to inherit on the part of the mother, means a capacity to inherit from all the kindred on the part of the mother. Among these kindred, too, he will recognize uterine brothers as the nearest, instead of rejecting them as incapable of the inheritance. It is indeed obvious that the revisors did not use the words in the technical sense just mentioned. They were used in contradistinction to kindred on the part of the father, and were absolutely necessary to mark that distinction which was intended, between the blood of the father, who was unknown, and the blood of the mother, about whom there was absolute certainty. This was the function of those words. They were not designed to draw a line of separation between the brothers of the bastard and his other maternal kindred, but between bis mother’s blood and his father’s blood. I conclude therefore, that a bastard may inherit from his mother, and from his uterine brothers also.
We come next to the second part of the clause. “ Bastards shall be capable of transmitting inheritance on the parí: of the mother, in like manner &c.” Observe, the words are not “ an inheritance,” or “ an estate of inheritance, on the part of the mother,” or “de *394 rived from or through the mother.” There is no limitation of the inheritable character to lineals in exclusion of collaterals, orto descendants in exclusion of ascendants. The terms of the act are general and comprehensive, and we have no authority to limit or control them. Our duty is to ascertain their meaning. What is "that meaning?
Though the word transmit is not regarded by counsel as the important word in this clause, I think it nevertheless important to observe that it is a word of two significations, and is in this passage, I conceive, used in both its senses. It implies, in connection with inheritance, the transmission of an estate by descent, either from the bastard or through him. Nothing is more familiar than to speak of a person transmitting from himself. In that sense it means to convey, to transfer, to impart. I transmit money through the mail to Philadelphia. Here it is used in both senses. Vespasian transmitted his virtues and bis talents to his elder son. A good man transmits a good name to his children. In these instances, and in the following, it is used in the first sense.
“ Faults, like infectious blood, transmitted run
In one eternal stream from sire to son.” Juv. Sat. 14. line 3.
In like manner the word is used by lawyers, to indicate not only the transmission through a person, but the transmission from him. Blaclcstone lays down the rules “ whereby property is transmitted from one man to another.” 2 Bla. Com. 211. “Entry is necessary to make the tenant capable of transmitting his estate by descent.” Id. 209. “ Notoriety of possession is necessary in the ancestor, as evidence of that property in himself which is to be transmitted to his heir.” Ibid. “ An alien cannot transmit land from himself to others by descent.” 6 Peters 113, Thus we see, that while on the one hand it is admitted that a title may be transmitted through the bastard, the term will equally apply to the trans *395 mission of an estate from him. And the statute having used the word in the most general manner, we are at liberty, I conceive, to construe it to include both. “He shall have capacity to transmit inheritance,” may, without violence to the language, imply not only that his es-tale shall descend and pass from him to his kindred, which is the first and most obvious meaning, but also that he may be the medium through which others may deduce inheritance from their ancestors.
It is worthy of remark that the word “ inheritance,” in this connection, belongs to the word “transmit.” It seems to have been attempted to tear it from this alliance, and to unite it to the words “ on the part of the mother.” This could only have been upon the mistaken notion that inheritance here means an estate; and hence it is argued that an estate on the part of the mother alone can be transmitted under this clause. Nothing, I conceive, can be more fallacious. The words “ transmitting inheritance” combine to express merely the converse or counterpart of the word “ inheriting.” That single word conveys the complex idea of taking by descent from, others: whereas the two words “ transmitting inheritance,” united, are required for the expression of the opposite idea of transmitting by descent to others; there being no single word in the language to convey that meaning. They constitute therefore, together, a phrase with a distinct meaning, which forbids their separation from ea'ch other. Moreover, in this connection, inheritance does not mean estate; for it is used as the mere adjunct of the word transmit, for the purpose of pointing out the inheritable transmission of property from an intestate to his kindred.
If I am not mistaken in these views, a bastard is capable of transmitting by descent to his kindred on the part of his mother, either his own estate, or an estate derived from his mother or other ancestor, and may moreover be a medius ancestor, through whom inheri *396 tarice may be transmitted ex parte materna- Moreover, for the reasons already given, I am satisfied that the elliptical expression, “ on the part of the mother,” is to be made fall and complete, so as toread, “ to his kindred on the part of the mother;” which is, I think, the obvious legislative meaning. Under this construction, the mother and brothers had capacity to take, and the -estate should have been adjudged to them.
To this attempt to subject the statute to rigorous analysis, I will add some considerations which very strongly sustain the construction I have given.
First, the draughtsman of this bill has most obviously designed to frame a scheme of descents which should be complete and cover the, whole ground. This solicitude is as perceptible in reference to bastards, as in any other part of the act. The revisors seem to have carefully looked into the matter, and have sedulously provided for bastards under various circumstances. In this clause, a large and indeed much the most numerous class were the subject of provision. It is not probable that a half way legislation was designed. A construction, therefore, which leaves the subject almost as it was at common law, cannot be consistent with their views. Now, according to the decision of the supreme court (Stevenson’s heirs v. Sullivant, 5 Wheat. 207. 261.) the first part of this clause, which gives the capacity to inherit, is confined to the lineal kindred, to the exclusion of brothers and all collaterals j thus leaving the bastard as incapable as at common law of taking from uncles, cousins or brothers, whose estates shall pass to the commonwealth by escheat, rather than descend upon one whose capacity the lawmakers designed to restore, and are confessed to have restored in so far as respects the lineal ancestors. By what warrant the court confined a general capacity to inherit, to the lineal kindred, I am at a loss to determine ; for even the great resource in this case (the words “on the part of their *397 mother”) confessedly will not sustain the decision. Nor is it easier to imagine why the law should (as to inheriiauce on the part of the mother) have made a distinclion between the grandfather on the one hand, and the uncles, cousins or brothers on the other; thus leaving far the most numerous class of cases unprovided for. For, according to the construction of the supreme court, the first clause could only apply in the rare cases of a descent from the mother, or maternal grandfather or grandmother, or other yet more remote lineal ancestor. The chanco of the bastard’s inheritance from these sources must be comparatively very remote. Whereas the chances from uncles, brothers and cousins, which are supposed to be unprovided for by the law, would be of frequent occurrence. So, too, as to the second part of the clause. The bastard, it is allowed, may be a medius of inheritance from the mother or grandparents to his own children (a case certainly not likely to happen very often) while it is denied that he can be the medias of inheritance from his own children to his mother or other lineal ancestor; and moreover it is denied that the provision applies to his own estate, which must, in case of intestacy without issue, pass to the commonwealth by escheat, rather than to his collateral kindred, or even his mother or uterine brothers and sisters. Thus the parade of rehabilitating the bastard results in a provision of minor importance, while the all important disposition of his ovrn estate is left altogether as the revisors found it. I cannot suspect them of emulating the mountain in labour; and as it seems to bo conceded that “ they intended to provide a complete and perfect system of descents” (per Cabell, J. in Davis v. Rowe, 6 Rand. 424.) — -as that system was confessedly founded upon a just and liberal and benevolent theory of the human affections (5 Call 144, 145, 147.) — and as the construction contended for leaves their work half done, and violates the very principles which the lawgivers obviously adopted, J discard it without hesitation. I do so the *398 more readily, because it certainly leads to the absurdi- . , . J . . . , . tres and inconsistencies mentioned in the argument. Thus it has already been shewn that under the first clause the bastard may inherit of his legitimate uterine brother. But according to the construction put upon the latter clause, the legitimate could not inherit from him. Thus the legitimate would be on a worse footing than the bastard, and the spurious would seem to find most favour with the law. Moreover, if the bastard's estate is not within the second clause, as has been contended, then under the first clause the bastard’s family would to all time be inheriting from the legitimates, while under the second clause the legitimates could not inherit from the bastard or his family. It is easy to see where the estates would be accumulated after a few generations, if left to descend according to this interpretation of the statute. So if the bastard dies, and his estate descends to his son, who dies, it may go to the mother of the bastard, although if he had died without children, she could not have taken it from him. I am aware that, to avoid this consequence, it was contended that the transmission could not be upwards; but I can see not even a plausible ground for limiting and •curtailing the very general terms in which the clause is ■expressed, and confining the transmission to the descending line.
In the foregoing examination I have said nothing of the cases cited, because I think they have little influence upon the question. The case of Steve?ison's heirs v. :Sullivanl, indeed, seems to have established principles which may be brought to bear upon this, though the cases themselves are very different. But that case is, I think, so obviously erroneous in its total exclusion of collaterals, that I decline to follow it, notwithstanding the high respect which is due to the able bench by which the decision was pronounced. It has been truly said, too, to have no binding authority upon us. On the contrary, the supreme court defers to the judgment of *399 this court, in the construction which it gives to Virginia ’ statutes.
Upon the whole, I am of opinion that the mother and her sons were capable to take the estate of the bastard, and that the decree is only erroneous in adjudging it to her alone. Her sons must also come into the inheritance with her; but hers will be a double portion, under the provisions of the 15th section, the brothers being all of the half blood to the deceased. I should most truly have regretted a contrary decision, as I should have regarded it as a practical repeal of one of the wisest and most beneficent provisions of our law of descents ; and I should indeed have been very sorry to see that statute, which I had over been taught to look upon as full formed and perfect, “ curtailed of its fair proportions, and sent into the world, deformed, unfinished and but half made up.”
The decree of the court of appeals was in the following terms: “ This court is of opinion that there is no error in the decree, against the appellant; but the court is of opinion that the bastard brothers of the decedent, as well as his mother, were entitled to take as his heirs and distributees under the eighteenth section of the law of descents, the mother being entitled to one half and the brothers to one fourth each, under the fifteenth section of the same act; and that the decree is erroneous in decreeing to the mother only: therefore it is decreed and ordered that so much of the said decree as is above declared to be erroneous, be reversed and annulled, and that the residue thereof be affirmed; and also that the appellant do pay unto the appellees, as the parties substantially prevailing, their costs by them about their defence in this behalf expended. And it is ordered that the cause be remanded to the said circuit superiour court, to be finally proceeded in, pursuant to the principles of this decree.”