Ranney, J.
Individually, I am very far from being satisfied with the construction put upon section 12 of the act of 1831, in the case of Lessee of Little v. Lake, 8 Ohio, 289, founded upon the authority of Stevenson’s Heirs v. Sullivant, 5 Wheat. 207. That section provides : “Bastards shall also be ^capable of inheriting, or of transmitting inheritance on the part of their mother, in like manner as if they had been born in lawful wedlock.” Both the cases referred to agree in holding that the language of the statute is only sufficient to remove the common-law impediments to a lineal inheritance, leaving the illegitimate child, subject to all the disabilities of bastardy, as to his collateral kindred. But they seem to differ in one important particular — the last treating the statute as having been designed to restore the current of inheritable blood, so as to enable him to transmit inheritance, in the descending line, and to inherit directly from his mother, or, by right of representation, to take any property “ which would have vested in her, as fieir to any of her ancestors, had she lived to taire as such ; ” while in the first it is said that .“the expression on the part of the mother does not carry the mind beyond the mother, unless connected with words of more comprehensive meaning — such as ancesters on the part of the mother, or descendants on the part of the mother.” 'The one would seem to leave the lineal inheritance wholly unembarrassed ; while the other would rise no higher than the mother, and confine the effect of the statute to an inheritance to or/rcmher, in the direct line. If great strictness is to be indulged, there is *357 little difficulty in seeing that it is most judiciously applied in the ■Ohio case. For, if the bastard can not be said to be related to the ■children of his own mother, I can see very little reason in making him related to a grandfather, or some more remote ancestor.
The narrow construction adopted in both these cases is said to be founded upon the settled meaning of the expression, ex parte materna, when used in reference to the course of descent of real property in the English law. I may not fully understand what rule is intended to be here invoked. I know of none but that strict rule of feudal policy embodied in the fifth canon of descents, which confined the estate to the blood of the first purchaser. If the estate came through the paternal line to the person last seized, *it should never descend to the one in the maternal; and, e converso, if it came through the maternal line, it should never descend to ■one in the paternal, but should rather escheat to the lord of the fee. Yery anciently, it is true, & feudum novum, could only descend to the lineal descendants of the first acquirer. But more than a century ■before the passage of our statute, this harsh rule of a military system had been entirely abrogated in England; first, by granting a feudum novum to be held ut feudum, antiquum; and finally, by considering every acquisition of an estate in fee simple by purchase, as & feudum antiquum, or feud of indefinite antiquity; thereby enabling the collateral kindred of the grantee, or descendants from any of ■his lineal ancestors, by whom the lands might possibly have been purchased, to succeed to the inheritance. 3 Cruise’s Dig. 380.
But let it be granted (what, I think, no amount of industry could prove), that a part of the language of our statute is a tolerable ■translation of words which imported an exclusion of collaterals, in the English law, and still but little is done toward arriving at the ■intention of the plain men who passed the act of 1831 — four-fifths of whom were ignorant of the existence of any such rule, and of the language in which it is expressed. To find what they intended, it is necessary to consider ail they have said, and to interpret it in accordance with the usual and ordinary signification of the language employed. When this is done, I find it impossible to doubt, that it was intended to abrogate the common-law doctrine, so far as to declare that the bastard, instead of being nullius filius, ■should thereafter, in law as in fact, be the son of his mother; and as .such, not only capable of receiving inheritance directly from her, and of transmitting inheritance directly to her, but also, through *358, 359 her as the common ancestor, from or to any one of her blood “ in. like manner ” (to use the language of the statute) “ as if he had been-born in lawful wedlock.” I find myself confirmed in the view I have expressed, by the unanimous judgment of the Supreme Court of Vermont, in Town of Burlington v. Fosby, 6 Vermont, 83, *upon a statute nearly-identical with ours; and by the weighty opinion of Chief Justice Reeve, in his treatise on the law of descents, p. 96, where he says: “ By the terms, on the part of the mother,. we are to understand not only that the mother may inherit to the illegitimate children, and the illegitimate to the mother, but that any relative on the part of the mother may inherit to the illegitimate child, and the illegitimate child may inherit to any relative on the part of the mother.”
Concurring fully in this construction, I should have felt bound, notwithstanding the high respect I entertain for the courts that have held otherwise, to have affirmed the judgment, did the whole case depend upon the act of 1831.
But I agree with the court, that it does not necessarily depend upon that act; and that all difficulty has been removed by the act of March 14, 1853, regulating descents and the distribution of personal estates. 3 Curw. Rev. Stat. 2270. What is the case before us ? Henry C. Perkey was the illegitimate son of Catherine Blume, and having survived his mother, died in the month of J anuary, 1852, without issue, unmarried, and intestate, leaving about six thousand dollars in personal property. After his birth, she intermarried with Eutsler, and had issue, one son and throe daughters. The property is claimed by them as the lawful heirs of Perkey, on the one hand, and by the state, or rather by the agricultural society of the state, as an escheat, on the other.
A man needs- little more than his instincts to determine what the-law ought to be in such a case. Perkey had no election whether he-should be born legitimate or illegitimate, It was no fault of his that he was born illegitimate, and he had the same right as others, •whose origin was more fortunate, to be judged by his own personal conduct, and not only protected in the enjoyment of what he should acquire while he lived, but to have what remained of it transmitted to his blood when he died. In his case, as in others, such security-furnished the strongest possible ^stimulus to that industry and economy, upon which the prosperity of states depends; and,. *360 for the most cogent reasons, precluded the state from intervening' to impair it.
Yery good reasons, founded upon public policy, and growing out of the uncertainty that must generally attend the paternity of the-illegitimate child, can be given, for cutting him off from all connection with the paternal line. To this necessity, he must submit. But no doubt can exist as to the identity of the mother. The child is necessarily reared by her; and between them, as well as between the child and her other children, must grow up those strong ties-which bind near kindred to each other. However sternly the law may declare that there is no relationship, nature will assert her-supremacy, and stamp the declaration as unfounded.
The most subtle ingenuity would fail to suggest even a plausible-reason why these persons should not inherit to each .other; and the state could in no way prevent it, and take the property from them, without incurring the imputation of gross injustice.
These considerations, I am very well aware, are in no way decisive of the true construction of either the act of 1831 or of 1853. But a construction that ignores their influence, upon those who enacted these laws, may well be doubted; and hence arises the legal principle, which requires doubtful or equivocal language to be so construed as to avoid absurd or unjust consequences; and it is with that view, that I present them.
Upon the disputed question arising upon the act of 1831, section 15 of the act of 1853, has removed all doubt, by adding: “And if the mother be dead, the estate of such bastard shall descend to the-relatives on the part of the mother as if the intestate had been legitimate,”
If the case is to be governed by this act, there is no difficulty;. and whether it is to be so governed, must depend upon a fair construction of all its provisions, taken and considered together. In no other way, can the intention of the general assembly be ascertained.
*Perkey died before this act was'passed; but it took effeet while the estate was in the course of settlement, and before any order of distribution was made. By section 21, the act of 1831 is unconditionally repealed. Section 22 provides: “This act shall not affect any estate, to which any natural person shall have become entitled, by or under any statute of the state heretofore in. force; but this section shall not apply tr escheats to the state."
*361 Now, it is perfectly evident that the whole of this section is a mere saving clause to the operation of section 21; and it is equally clear, that the general assembly did not intend to save for the state all the rights that it intended to save to natural persons; that a distinction was intended between the right to an escheat, and other righ.g of natural persons, derived from the act- of 1831.
All the rights of the state to this property, were derived from, .and depended upon , that act, and, in repealing it, the legislature has very plainly said, not only that they should not be saved, but that they should be relinquished. In so saying, no principle of justice, constitutional power, or legal propriety has been invaded/
The clause added to section 15, of the act of 1853, contains a very distinct acknowledgment of the injustice of the act of 1831, or of ■the construction put upon .it. No constitutional impediment existed to prevent an instant correction of this injustice, by relinquishing all rights under it. While the vested rights of private persons, and of private corporations, are very properly placed beyond the reach' of the general assembly, its power over such public interests is left wholly unrestricted. Indeed, if the state had actually received the property, there would have been no difficulty in restoring it to those justly entitled to it.
There is certainly nothing in the act of 1853, that evinces an intention to make it retrospective in its operation; nor was it neces.sary that there sko.uld have been. When Perkey died, the legal .title .to all his personal property vested in his personal representative." *He alone could sue for and recover it, and convert it into money. ' It vested in him, it is true, as a mere trust estate, for the benefit of creditors and distributees. The right to distribution was a vested right, and if it had belonged to a private j>er-,son, could not have been impaired by subsequent legislation. In such case, the distribution must have been made according to the law in force when the right accrued ; but it belonged to the state, and she had unlimited control over her own interests. Before the time for ■distribution arrived, she had repealed the only law that ever placed her in connection with the estate, and had expressly provided that her rights should not be saved. By another part of the repealing a vt, she had put the defendants in error in such connection, and had, in effect, ordered the distribution to be made to them. The whole effect, therefore, of these sections of the act, was to operate ■the relinquishment of an interest then existing, and to create a ca- *362 pacify in others to take it. I am well enough satisfied that this-construction carries out the intention of the general assembly, but 1 should be better satisfied to decide the case upon what I must still consider the proper construction of the act of 1831.
We do not find it necessary to pass upon the question raised by counsel, as to whether' section 4 of the act of 1853 could, consistently with section 16 of article 2 of the constitution, have effected, an implied repeal of the act of February 8,1847. (2 Curw. Rev. Stat. 1342.) By this act, escheated property was to be taken possession of by the auditor of the county, and converted for the benefit of the state agricultural fund; while the act of 1853 required? the prosecuting attorney to collect it, and applied it to the exclusive support of common schools, without expressly repealing the act of 1847. Before either officer could act, or either fund be replenished, escheated property must exist. Being merely public instrumentalities, it was within the power of the legislature to take it from the one and give it to the other; or to do what we think has-been done, *take it from both and give it to those better entitled, by relinquishing the right of the state to the escheat. When property is found undoubtedly escheated to the state, it will be? time to decide which of these funds can make the best claim to it.
The judgment of the district court is affirmed..